# UNITED STATES ET AL. *v.* CAROLINA FREIGHT CARRIERS CORP.

No. 197.   Argued January 16, 1942.—Decided March 2, 1942.

476

*Mr. J. Stanley Payne,* with whom *Messrs. Daniel W. Knowlton* and *Nelson Thomas* were on the brief, for the Interstate Commerce Commission; and *Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. Frank Coleman* and *Smith R. Brittingham, Jr.* submitted for the United States, appellants.

*Mr. Wilmer A. Hill,* with whom *Mr. Harry C. Ames* was on the brief, for appellee.

*Messrs. Luther M. Walter, John S. Burchmore,* and *Huel D. Belnap* filed a brief on behalf of the Irregular Route Common Carrier Conference of the American Trucking Assns., Inc., as *amicus curiae,* urging affirmance.

Mr. Justice Douglas delivered the opinion of the Court.

This is an appeal under § 210 (28 U. S. C. § 47a) and § 238 of the Judicial Code as amended (28 U. S. C. § 345), to review a final decree of a district court of three judges (28 U. S. C. § 47) which set aside (38 F. Supp. 549) an order of the Interstate Commerce Commission (24 M. C. C. 305) granting appellee a certificate of public convenience and necessity as a common carrier by motor vehicle under the so-called "grandfather clause" (§ 206 (a)) of the Motor Carrier Act of 1935 (49 Stat. 543, 551, 49 U. S. C. § 306), now designated as Part II of the Interstate Commerce Act. 54 Stat. 919.

Appellee's predecessor applied for such a certificate authorizing operation as a "common carrier" by motor

478

vehicle of "general commodities" [1] between all points "in South Carolina, North Carolina, Delaware, New Jersey, Connecticut, Rhode Island, Massachusetts, those in Virginia east of and including the Shenandoah Valley, those in Maryland and Pennsylvania on and east of U. S. Highway 11, and those in New York east of Binghamton and south of Albany; and between Cherryville (N. C.) and Boston, Mass., through Henderson, N. C., Richmond, Va., Baltimore, Md., Philadelphia, Pa., and New York, over irregular routes." The Commission authorized the issuance of a certificate but restricted its scope in three ways. (1) It cut down the geographical area which could be served by appellee, and in parts of that area limited the service to designated points. (2) It allowed appellee to haul only certain specified commodities out of a larger list previously hauled. (3) It did not permit appellee to haul all of those specified commodities between all of the points in the authorized territory, but allowed it to haul only certain commodities between given points. Its finding containing those restrictions (24 M. C. C., p. 309–310) reads as follows:

"We find that applicant's predecessor in interest was on June 1, 1935, and continuously since it and its predecessor have been, in bona fide operation as a common carrier by motor vehicle, in interstate or foreign commerce (1) of cotton yarn from all points in Gaston, Lincoln, Cleveland, Rutherford, McDowell, Burke, Catawba, Alexander, Iredell, Rowan, Davidson, and Davie Counties, N. C., to Hagerstown, Md., New York, N. Y., Pawtucket and Providence, R. I., all points in Pennsylvania on and east of U. S. Highway 11, and points in Middlesex, Union, Essex, Hud-

---

[1] With the exception of "commodities of unusual value, those in bulk, those requiring special equipment such as tank or refrigerator trucks, those injurious to other lading, live stock, automobiles and high explosives."

son, Passaic, Bergen, Somerset, and Morris Counties, N. J., (2) of asbestos textile products from Charlotte, N. C., to Philadelphia and North Wales, Pa., Trenton, Newark, Passaic, and Paterson, N. J., New York, N. Y., Middletown, Conn., Providence and Pawtucket, R. I., and Boston and Hudson, Mass., (3) of supplies and materials used in the manufacture of asbestos textile products from Harrison and Perth Amboy, N. J., to Charlotte, N. C., and empty spools and boxes in the reverse direction, (4) of petroleum products in containers from Sewaren, N. J., and Marcus Hook, Pa., to Columbia and Greenville, S. C., and to all points in North Carolina, (5) of linoleum from Paulsboro, N. J., Marcus Hook, Pa., and East Walpole, Mass., to points in North Carolina and to Spartanburg and Greenville, S. C., (6) of canned goods from Baltimore, Md., to Shelby, N. C., (7) of beer and ale from Newark, N. J., to Gastonia and Wadesboro, N. C., and (8) of roofing and screen wire from York, Pa., to all points in North Carolina, all over irregular routes; that applicant is entitled to a certificate authorizing continuation of such operation; and that the application in all other respects should be denied."

The District Court held that such restrictions were not authorized by the statute. It said:

"It is, of course, reasonable to limit the certificate to the type of service rendered by the carrier during the grandfather period, and to limit the territory to that within which substantial service of that type has been rendered; but it is unreasonable to limit the certificate of one who has functioned as a general carrier to the specific commodities carried and the specific points served. The law cannot reasonably be construed as authorizing such limitation."

It further noted that such restrictions have not been imposed on regular route carriers and that Congress has

made no such distinction between them and irregular route carriers like appellee.

I. We think the Commission was justified in the restrictions which it placed on the geographical scope of appellee's operations. Sec. 206 (a) of the Act authorizes the Commission to issue a certificate without a showing of public convenience and necessity if the carrier or its predecessor in interest was "in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time." Sec. 208 (a) requires that the certificate specify "the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, and in case of operations not over specified routes or between fixed termini, the territory within which, the motor carrier is authorized to operate." It is clear from these provisions that the power of the Commission to authorize future operations within a designated "territory," rather than over specified routes or between fixed termini, fits the peculiar requirements of irregular route operators such as appellee. Authority to operate within a specified "territory" may include permission to service all points in that area. On the other hand it may be restricted to designated points therein. Or as in the instant case, it may extend to all points in a part of that area and to selected localities in another part. The precise delineation of the area or the specification of localities which may be serviced has been entrusted by the Congress to the Commission. *Alton R. Co.* v. *United States, ante,* p. 15. The Act provides the test of "bona fide operation." That standard carries the connotation of substantiality. It also makes clear that a holding out to serve a specified area is not alone sufficient. It is "actual rather than potential or simulated service" which is required. *McDonald* v. *Thompson,* 305 U. S. 263, 266. Substantial, as

distinguished from incidental, sporadic, or infrequent, service is required. Substantial service actually rendered may have been confined to narrow limits. *Loving* v. *United States,* 32 F. Supp. 464, aff'd 310 U. S. 609. Ability to render the service throughout the wide reaches of the territory, which the applicant professed to be willing to serve, may not have existed. Furthermore, the characteristics of the transportation service rendered are relevant to the territorial scope of the operations which the Commission may authorize. *Alton R. Co.* v. *United States, supra.* In addition, the Commission, in determining the precise territory which may be served by a particular carrier, cannot be unmindful of its responsibility to coördinate the various transportation agencies which constitute our national transportation system. S. Rep. No. 482, 74th Cong., 1st Sess.; H. Rep. No. 1645, 74th Cong., 1st Sess. This does not mean that the right to the statutory grant may be withheld or cut down because the Commission disapproves of the competitive conditions which may be created if the application is granted. But its responsibility to bring greater order and stability to the transportation system than had earlier obtained (S. Doc. No. 152, 73d Cong., 2d Sess.) is an additional reason for its insistence upon a showing of substantial service in that territory which is sought to be covered by a certificate under the "grandfather clause."

As we indicated in *Alton R. Co.* v. *United States, supra,* the purpose of the "grandfather clause" was to assure those to whom Congress had extended its benefits a "substantial parity between future operations and prior *bona fide* operations." We cannot say that that was denied in this case, if the limitations on the territorial scope of the operations are alone considered. While service to and from all points in the States included in the application was not allowed, the reduction was determined by the standard of substantiality of service. And considera-

tion was given to the characteristics of irregular route carriers and their role in the national transportation system. That involved a weighing of specific evidence in light of the complexities of this transportation service. The judgment required is highly expert. Only where the error is patent may we say that the Commission transgressed. That is not this case.

II. We have doubts, however, as to the restrictions which the Commission has placed on the articles which appellee may carry. Sec. 203 (a) (14) defined [2] the term "common carrier by motor vehicle" as one who "undertakes . . . to transport passengers or property, or any class or classes of property, for the general public in interstate or foreign commerce by motor vehicle for compensation, whether over regular or irregular routes." The Commission ruled that since a "common carrier" may transport only a "class or classes of property," the authority granted under the "grandfather clause" of § 206 (a) "should reflect any limitation in the undertaking" of the common carrier "as indicated by the service actually rendered on and since the statutory dates." It accordingly proceeded to eliminate commodities which, though of the same general class as the others, had been carried before but not after June 1, 1935. It further restricted future operations to those commodities which prior and subsequent to June 1, 1935, had been carried in substantial amounts and with a degree of regularity. We

---

[2] In 1940 Congress amended § 203 (a) (14) to read: "The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, . . ." Act of Sept. 18, 1940, c. 722, § 18 (a), 54 Stat. 920. The earlier definition of "common carrier" was in force at the time of the hearing of this case before the Commission.

would not disturb those conclusions if only a question as to the weight of the evidence was involved. But we are not satisfied that the Commission applied the proper criterion in reaching its conclusion that only specified commodities could be carried in the future.

Sec. 206 (a) requires a showing that the applicant, or its predecessor, was "in bona fide operation as a common carrier" on June 1, 1935, and "since that time." By § 208 (a) the certificate must specify "the service to be rendered" by the carrier. As we have noted, a "common carrier by motor vehicle" was defined in § 203 (a) (14) as one who "undertakes" to transport "passengers or property, or any class or classes of property, for the general public." That definition is the same for irregular and regular route carriers. It is plain that a carrier's holding out and actual performance may be limited to a few articles only. That is to say, he may be a common carrier only of a restricted number of commodities. See Galveston Truck Line Corp., 22 M. C. C. 451, 467. Or the service actually rendered may have been confined to such a few commodities that his holding out or willingness to carry a much larger class may be disregarded. *Loving* v. *United States, supra,* was such a case. On the other hand, if the applicant has carried a wide variety of general commodities, he cannot necessarily be denied the right to carry others of the same class merely because he never carried them before. And where he has carried a wide variety of general commodities, he cannot necessarily be restricted to those which he carried with more frequency and in greater quantities than the others. See H. B. Church Truck Service Co., 27 M. C. C. 191, 197; Highway Motor Freight Lines, Inc., 23 M. C. C. 621, 636. The Commission may not atomize his prior service, product by product, so as to restrict the scope of his operations, where there is substantial evidence in addition to his holding out that he

was in *"bona fide* operation" as a "common carrier" of a large group of commodities or of a whole class or classes of property. There might be substantial evidence of such an undertaking though the evidence as to any one article was not substantial. The broad sweep of his prior service may indeed have made the carriage of any one commodity irregular and infrequent. Yet, viewed as a whole rather than as a group of separate and unrelated items, his prior activities may satisfy the test of "bona fide operation" as a "common carrier" within the scope of his holding out. The fact that some of the articles may have been carried before but not after June 1, 1935, may of course indicate an abandonment of the prior undertaking. See *United States* v. *Maher,* 307 U. S. 148. But it does not necessarily mean that they should be stricken from the certificate, since the natural and normal course of his business may reveal a continuous undertaking to transport any or all commodities embraced within the group or the class. That is to say, he may have been a common carrier of a large group of general commodities or of an entire class of property both before and after the critical date though the specific commodities carried varied considerably. The questions are whether his service within the territory in question was sufficiently regular, and whether his coverage of commodities was sufficiently representative, to support a finding that he was in "bona fide operation" as a "common carrier" of the group of commodities, or of the class or classes of property, during the periods in question.

The Commission in this case authorized the carriage of about a dozen kinds of commodities, though in prior operations about three times that number had been carried. It is not our function to weigh the evidence. Hence we intimate no opinion as to whether more commodities should have been included had the proper criterion been employed. But we conclude that there is no

statutory warrant for applying to irregular route carriers a different or stricter test as to commodities which may be carried than is applied to regular route carriers. The difference between those types of carriers may well justify a sharp delimitation of the far flung territory which an irregular route carrier may profess to serve. But, once the territory has been defined, the statutory test of whether an applicant was a "common carrier" by motor vehicle in "bona fide operation" during the critical periods is the same for the irregular and the regular route carrier. We are not confident that the Commission has approached the problem in that way. For it has repeatedly stated, beginning with Powell Brothers Truck Lines, 9 M. C. C. 785, 791–792, that:

"Authority to transport general commodities throughout a wide territory over irregular and unspecified routes pursuant to the 'grandfather' clause of the act should be granted to a carrier only when such carrier's right thereto has been proved by substantial evidence. To do otherwise would create the very ills which regulation is designed to alleviate, namely, congestion of highways, destructive rate practices, and unbridled competition. Common carriers which are expected to maintain regular service for the movement of freight in whatever quantities offered to and from all points on specified routes cannot operate economically and efficiently if other carriers are permitted to invade such routes for the sole purpose of handling the cream of the traffic available thereon in so-called irregular-route service."

And see Merchants Parcel Delivery Co., 21 M. C. C. 93; Langer Transport Corp., 23 M. C. C. 302; Lett & Co. of Indiana, 26 M. C. C. 159.

Insofar as that view establishes a different test for commodities which may be carried by irregular route operators than for commodities which may be carried by

regular route operators, it is erroneous as a matter of law. For facts sufficient to establish that a person is a "common carrier" by motor vehicle in "bona fide operation" in the one case are sufficient in the other. The statutory differences lie only in the territorial scope and pattern of the operation.

III. It follows from what has been said that a restriction on commodities which may be carried between specified points may not always be justified. If the applicant had established that it was a "common carrier" for a group of commodities or for an entire class or classes of property and was in "bona fide operation" during the critical periods in a specified territory, restrictions on commodities which could be moved in any one direction or between designated points would not be justified. The fact that a particular commodity had never been transported between certain points in that territory would not mean that authority to haul it between them should be withheld. Likewise, if the applicant could establish that it was a "common carrier" only of a limited number of commodities, there would normally be no statutory sanction for limiting the carriage of particular commodities in that group to specified points in the authorized area. Presumptively, one who had established his status of "common carrier" would be entitled to carry all of the commodities embraced in his undertaking to all points to which any shipments of any articles were authorized. On the other hand, an applicant's status may vary from one part of the territory to another or be different in northbound shipments than in southbound shipments. Thus in this case the Commission found that practically all of appellee's northbound shipments consisted of cotton yarn, though a few shipments of other commodities such as tires and tubes, asbestos textile products, spools and empty boxes were also made northbound. With the exception of tires and tubes,

the Commission authorized the shipments of those products on northbound trips. Assuming that finding to be justified under the tests which we have described, it does not necessarily follow that the northbound destinations of those particular commodities should be restricted to the localities designated by the Commission. Once the common carrier status of appellee had been established as respects those commodities, shipments to any parts of the authorized territory, or to any of the authorized points therein, should have been permitted, in absence of evidence that the appellee as respects carriage between specified points had restricted its undertaking to particular commodities. That problem is clearer in this case as respects southbound shipments. The record is plain that appellee held itself out as being willing and able to carry a wide variety of commodities on its return trips to its home base in North Carolina. And the record shows that it carried many different kinds of articles on those southbound journeys. But the Commission drastically limited its rights in that regard. Thus it was permitted to carry beer from Newark, N. J. to two points in North Carolina, but not from Baltimore, Md. In absence of evidence that it had thus limited its undertaking as respects beer, the mere fact that it previously had not carried beer from Baltimore would be immaterial. If it had established by substantial evidence that it was a "common carrier" of beer on southbound trips, it would be entitled to carry it from any of the northern points to any of the southern destinations. For there was no evidence in this case that it had restricted its undertaking as respects beer to shipments from Newark, unless the fact that it had carried beer only from that point is to be conclusive. But to say that that was conclusive or controlling would be to disregard the natural and normal course of business shown by this record. So far as southbound shipments are con-

cerned, it is plain that a wide variety of articles was transported consistently with appellee's holding out that it would carry any of the articles from any of the points. Appellee's "bona fide operation" may possibly be limited only to those articles actually carried. But where it was actively soliciting whatever it could get at any of the points, it does violence to its common carrier status to make the origin or destination of future 'shipments conform to the precise pattern of the old. Such a pulverization of the prior course of conduct changes its basic characteristics. There is no statutory sanction for such a procedure.

IV. To appellee such matters involve life or death. Empty or partially loaded trucks on return trips may well drive the enterprise to the wall. A restriction in this case of the commodities which may be carried from any one point on southbound trips is a patent denial to appellee of that "substantial parity between future operations and prior bona fide operations" which the Act contemplates. *Alton R. Co.* v. *United States, supra.* Its prior opportunity should not be restricted beyond the clear requirements of the statute. For this Act should be liberally construed to preserve the position which those like appellee have struggled to obtain in our national transportation system. To freeze them into the precise pattern of their prior activities, as was done here, not only may alter materially the basic characteristics of their service, it also may well be tantamount to a denial of their statutory rights.

The precise grounds for the Commission's determination that only certain commodities could be carried and that only a few could be transported between designated points are not clear. It is impossible to say that the standards which we have set forth were applied to the facts in this record. Hence, as in *Florida* v. *United States,* 282 U. S. 194, 215, the defect is not merely one of the absence of a "suitably complete statement" of the reasons for the deci-

sion; it is the "lack of the basic or essential findings required to support the Commission's order." And see *United States* v. *Baltimore & Ohio R. Co.,* 293 U. S. 454, 464; *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 510–511. Congress has made a grant of rights to carriers such as appellee. Congress has prescribed statutory standards pursuant to which those rights are to be determined. Neither the Court nor the Commission is warranted in departing from those standards because of any doubts which may exist as to the wisdom of following the course which Congress has chosen. Congress has also provided for judicial review as an additional assurance that its policies be executed. That review certainly entails an inquiry as to whether the Commission has employed those statutory standards. If that inquiry is halted at the threshold by reason of the fact that it is impossible to say whether or not those standards have been applied, then that review has indeed become a perfunctory process. If, as seems likely here, an erroneous statutory construction lies hidden in vague findings, then statutory rights will be whittled away. An insistence upon the findings which Congress has made basic and essential to the Commission's action is no intrusion into the administrative domain. It is no more and no less than an insistence upon the observance of those standards which Congress has made "prerequisite to the operation of its statutory command." *Opp Cotton Mills, Inc.* v. *Administrator,* 312 U. S. 126, 144. Hence that requirement is not a mere formal one. Only when the statutory standards have been applied can the question be reached as to whether the findings are supported by evidence. That is why we cannot say that the Commission would be justified in placing the same restrictions on the certificate in this case had a correct construction of the Act been taken.

We express no opinion on the scope of the certificate which should be granted in this case. That entails not

only a weighing of evidence but the exercise of an expert judgment on the intricacies of the transportation problems which are involved. That function is reserved exclusively for the Commission. *United States* v. *Maher, supra; Alton R. Co.* v. *United States, supra.* Our task ends if the statutory standards have been properly applied.

*Affirmed.*

MR. JUSTICE JACKSON, dissenting:

MR. JUSTICE FRANKFURTER and I are unable to agree with this disposition of the case.

It overturns the exercise of a discretion which Congress has delegated to the Interstate Commerce Commission upon grounds which seem to us so unsubstantial as really to be a reversal on suspicion. The function of determining "grandfather" rights delegated in this case is not unlike the function dealt with in *Gray* v. *Powell,* 314 U. S. 402, in which we said that Congress could have legislated specifically as to individual exemptions but "found it more efficient to delegate that function to those whose experience in a particular field gave promise of a better informed, more equitable adjustment of the conflicting interests" (p. 412). We held that this delegation will be respected and that, unless we can say that a set of circumstances deemed by the Commission to bring a particular applicant within the concept of the statute "is so unrelated to the tasks entrusted by Congress to the Commission as in effect to deny a sensible exercise of judgment, it is the Court's duty to leave the Commission's judgment undisturbed" (p. 413). While the Court pays lip service to this principle, the Commission's decision is upset because, as the opinion states, "We have doubts"; "We are not confident"; and "We are not satisfied." The opinion proceeds as it might do with a burden upon the Commission, although we supposed the burden to be upon those who

complain of an administrative decision to satisfy the Court that the decision is wrong—particularly one dealing with an exemption from a general duty.

We do not agree that a remand to the Commission to make specific findings of the kind required in *Florida* v. *United States,* 282 U. S. 194, 215, is appropriate. In the *Florida* case, the Commission undertook to revise intrastate railroad rates under control of the state and over which, as Chief Justice Hughes said, "the Commission has no general authority." 282 U. S. at 212. It was required to support its jurisdiction to revise rates not within its general control by specific findings as to whether those rates in any way constituted a burden on interstate commerce. The Court had earlier established the rule that an order of the Commission should not be given precedence over a state rate statute otherwise valid "unless, and except so far as, it conforms to a high standard of certainty." *Illinois Central R. Co.* v. *Public Utilities Commission,* 245 U. S. 493, 510. And in this connection the Court pointed out that even an act of Congress is not to be construed to supersede or suspend the exercise of the reserved powers of the state, even where the Constitution permits, "except so far as its purpose to do so is clearly manifested." It is one thing to require the Interstate Commerce Commission to be explicit in finding jurisdictional facts before it invades conceded state power. It is a wholly different thing to read with a hostile eye the Commission's findings that a claim for exemption from conceded federal regulatory authority has not been sustained.

Furthermore, if after this case is returned to the Commission, the Commission should leave no room for doubt that in making the challenged order it acted upon correct notions of law, it may yet be upset because the Court says its findings are not sustained by the evidence, it

had better be said now.   We have here a small record and simple facts, which are all before us, giving adequate basis for concluding whether these facts as found by the Commission warranted the order.   On this record it is plain what the Commission has done.   The only question is—Can it do what it has done?   To send the case back to the Commission to be reconsidered or to say that it has already been considered in the light of the legal views which the Court expresses, and then, perhaps, to say that in any event the order is not warranted on the record before us, is really to invite the Commission to express abstract views on law.   What this amounts to is that the Court refuses to tell the Commission what it thinks about the evidence until the Commission tells what it thinks about the law.   We cannot regard this as the most helpful use of the power of judicial review.

Congress by the Motor Carrier Act of 1935 cast upon the Commission the task of regulating the motor carrier industry.   By the enactment, Congress asserted that the public interest in the motor carrier enterprise had become paramount to private interests.   The highly individualistic nature of the business and the easy terms upon which equipment could be obtained had promoted a quick growth accompanied by intense and uneconomic competition, both within itself and with other transportation systems.   It was not expected that a sprawling, chaotic, and cutthroat industry that had developed entirely in the private interest would be reduced to an orderly and regularized system of transportation in the public interest without stepping on a good many individual toes.[1]

---

[1] See Report of Joseph B. Eastman, Federal Coordinator of Transportation, on the Regulation of Transportation Agencies other than Railroads.   Sen. Doc. No. 152, 73rd Cong., 2nd Sess., p. 13 *et seq.*

See also Report of the Committee on Interstate Commerce on the Motor Carrier Act, 1935, Sen. Rep. No. 482, 74th Cong., 1st Sess.

In trying to limit the injury caused by transition from a purely private enterprise to a regulated public service industry, the general plan was to preserve to private owners the transportation values evidenced by actual conditions of operation on June 1, 1935, and to exempt them from meeting the requirements of "public convenience and necessity" as to such operation. Those who obtained such "grandfather" rights are not, however, limited to them. They may expand their territory or extend their service by proving that public convenience and necessity will be served thereby. Thus, the scramble for "grandfather" rights represents the effort to pre-empt territory and service privileges without submitting to the test of the public interest. Public regulation would be defeated at its very outset if the Commission permitted the bulk of the industry to escape the public interest test by inflated claims under the "grandfather" clause. The nature of the general task of reducing the claims of "grandfather" rights to defined and reasonable limits consistent with the plan of public regulation is disclosed by the record in this case.

The motor carrier here asked as a matter of right that the Commission certify its "grandfather" privileges to include the carriage of general commodities in a territory comprising substantially the Atlantic seaboard from South Carolina to Massachusetts. That there was some disparity between its hopes and its experience was indicated by the fact that on June 1, 1935, it was operating eight trucks, and by 1936, the number of usable vehicles had fallen to four. After a change of ownership the number was increased, and at the time of hearing the applicant was operating seventeen carrying units.

This carrier did not operate at stated times or over regular routes, but was an irregular route carrier. The backbone of its business consisted of carriage of cotton

494

yarn from points of origin in the South to points of distribution in the North. Incidental to this carriage it was ready to accept cargo of almost any kind to complete its loads and particularly to provide earnings on return trips. If satisfactory terms could be arrived at, it was willing to carry almost anything almost any place. On the basis of such general holdings-out, this carrier sought certificates that would entitle it as a matter of right to carry nearly everything within the territory described.

The Commission cut down the claims of the applicant by the use of the standard which the Act prescribes: namely, *bona fide* operation as a common carrier by motor vehicle. The Commission reduced the territorial claim to that which the carrier actually served with some regularity, and lopped off territory which had been served only occasionally or by isolated trips. It limited the commodities to be carried to those carried in substantial volume during the period before and after June 1, 1935. We find no basis upon which we can say as matter of law that these general methods of reducing nebulous and extravagant claims to a compass which the Commission could properly certify as representing *bona fide* operation are improper or other than those contemplated by the statute.

The Court is "not confident" that the Commission applied to this irregular route carrier the same test as to commodities that is applied to regular route carriers. We cannot be so confidently unconfident. The Commission seems to have made only the distinction between irregular and the regular route carriers that results from the differences inherent in the two types of enterprise. The Commission has tested both by the regularity and substantiality of their actual operations. It is a test with which they may have unequal ability to comply, but to reach different results on such different facts does not imply

either the use of different legal standards or discriminatory administration.

The administrators of the Motor Carrier Act must be aware, as the framers of it were, that "the grandfather clause as of June 1, 1935, has been fixed in fairness to *bona fide* motor carriers now operating on the highway and limited so as to prevent speculation which is highly important." Report of the Committee on Interstate and Foreign Commerce, H. R. Rep. No. 1645, 74th Cong., 1st Sess., p. 4. When a carrier claims grandfather rights to serve the entire Atlantic seaboard as a general common carrier with equipment consisting on the critical date, of eight trucks, the Commission is obviously forewarned that it must guard against granting franchise privileges that will result in their having a speculative value to the carrier rather than a service value to the public. The Commission was quite right to take the measure of the territory and service of such a claimant and to give him a certificate covering his actual substantial operations. We should not substitute our own wisdom or unwisdom for that of administrative officers who have kept within the bounds of their administrative powers. *A. T. & T. Co.* v. *United States*, 299 U. S. 232, 236.