ELLIOTT BROS. TRUCKING CO., Inc., v. UNITED STATES et al. (INTERSTATE COMMON CARRIER COUNCIL OF MARYLAND, Inc., Intervener).

Civil Action No. 2385.

District Court, D. Maryland.

March 8, 1945.

E. B. Ussery, of Washington, D. C., Harvey C. Bickel, of Baltimore, Md., and J. E. Hummer and C. V. Guthrie, both of Washington, D. C., for plaintiff.

John R. Norris and James J. Doherty, both of Baltimore, Md., for Intervenor Interstate Common Carrier Council of Maryland, Inc.

Wendell Berge, Asst. Atty. Gen., Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, of Washington, D. C., Edward Dumbault, Sp. Asst. to Atty. Gen., and Gordon C. Locke, Atty., Interstate Comerce Commission, of Washington, D. C., for Interstate Commerce Commission.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., for defendants.

Before SOPER, Circuit Judge, and COLEMAN and CHESNUT, District Judges.

SOPER, Circuit Judge.

Elliott Brothers Trucking Company, Inc., of Easton, Maryland, seeks to set aside and enjoin the enforcement of an order of the Interstate Commerce Commission issued April 12, 1944 wherein the Commission denied in part the application of the Trucking Company for a certificate of public convenience and necessity under the "grandfather" clause contained in § 206 (a) of the Interstate Commerce Act, 49 U.S.C.A. § 306(a), and granted only a certificate whereby authority to transport was limited to general commodities (with certain named exceptions) moving southward from New York to Havre de Grace and points on the Eastern Shore of Maryland and from Philadelphia to Havre de Grace, to coal moving southward from points in Pennsylvania to Tilghman, Maryland, and to canned goods and seafood moving northward from Baltimore and Havre de Grace, Maryland and points on the Delmarva Peninsula. The gist of the complaint is that the order denied the Trucking Company the right to transport general commodities outbound from points on the Delmarva Peninsula in the same manner as it was authorized to transport canned goods, and also denied authority to transport general commodities from Philadelphia to points on the Eastern Shore of Maryland. The Trucking Company makes the additional objection that it was denied the opportunity to present evidence to show, irrespective of the "grandfather" clause, that the proposed service was required by the public convenience and necessity under the general provisions of § 207 of the Act, 49 U.S.C.A. § 307. The case is submitted to the court on the evidence taken in the proceeding before the Commission.

Under the "grandfather" clause, the Commission, without requiring further proof that the public convenience and necessity will be served, must issue a certificate if a carrier applicant or its predecessor in interest was in bona fide operation as a common carrier by motor vehicle

on June 1, 1935, over the routes or within the territory covered by the application, and has so operated since that time. But in such a case, the burden of proof is on the carrier to show that its past operations entitle it to the special privilege conferred by the statute, and the Commission has the duty to determine whether the proof measures up to the requirements, and its findings in this respect must be sustained on review, if supported by substantial evidence. See, Gregg Cartage & Storage Co. v. United States, 316 U.S. 74, 62 S.Ct. 932, 86 L.Ed. 1283; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971; Hanna Furnace Corp. v. United States, D.C., 53 F.Supp. 341, affirmed by the Supreme Court October 9, 1944, 65 S.Ct. 41; Id., 65 S.Ct. 112.

We therefore turn to an examination of the findings of the Commission and of the evidence upon which the plaintiff relies to support the charge that the restrictions placed in the certificate by the Commission were not justified. The essential findings of the Commission were substantially as follows: The Trucking Company has been engaged in motor transportation since 1928; it operated five trucks on June 1, 1935, and eighteen at the time of the hearing, February, 1943. It was not until after June 1, 1935, that the company began to keep complete records of its shipments. In April or May, 1939, nearly all of its records were inadvertently destroyed by fire and the evidence of its prior operations consisted of oral testimony which revealed that the service in one direction from the beginning through the year 1938 differed from that in the opposite direction.

In respect to northbound operations the Commission said:

### "Northbound Operations

"As seen, the oral testimony does not generally disclose the volume of traffic handled by applicant. It appears clear that prior to 1939, applicant transported shipments of canned goods, seafood, empty containers, vegetables, live and dressed poultry and returned materials, such as baskets, boots, aprons, and tools, northbound. The abstracts disclose 66 shipments were transported in 1938, 38 of canned goods, 22 of seafood, 3 of cantaloupes, 2 of empty containers, and 1 of vinegar. During 1939, 137 shipments were transported, 96 of canned goods, 34 of seafood, 5 of cantaloupes, and 1 each of vinegar and empty containers. During 1940, 210 shipments are shown, 145 of canned goods, 62 of seafood, 2 of wool, and 1 of empty containers. During 1941, 268 shipments were transported, 206 of canned goods, 58 of seafood, and 1 each of jars, machines, pickles in barrels, and spices. In 1942, a greater variety of commodities were transported northbound but canned goods and seafood continued to represent the bulk of applicant's traffic. Out of 538 shipments, 442 were canned goods and 38 were seafood. The remaining 58 shipments consisted of the following: 24 of peppers, pickles, or pimentos, in barrels; 6 of 'rollmop'; 5 each of empty containers and hosiery; 4 of hardware; 3 of vegetables; 2 each of fertilizer, holly and tires; and 1 each of books, lumber, tanks, vinegar, and 'miscellaneous freight'.

"Approximately 95 percent of the northbound shipments during 1939 consisted of canned goods and seafood. During 1940 and 1941 approximately 98.5 percent, and during 1942 approximately 90 percent, of the northbound shipments consisted of the above commodities. Even if we were to assume that applicant's northbound operations prior to 1939 were consistent with its claimed holding out, it has not so operated since that time. Upon consideration of all the evidence, we conclude that the service actually rendered northbound from 1939 through 1942 was definitely confined to such a few commodities that applicant's claimed holding out or willingness to carry a larger class may be disregarded. We, therefore, conclude that applicant is entitled to authority to transport only canned goods and seafood northbound."

In respect to southbound operations the Commission said:

"As seen, applicant is entitled to authority to transport only canned goods and seafood northbound, and it seems clear that its northbound operations are and have been its primary undertaking. On the other hand, its southbound operations unquestionably have been in the nature of a return service. Upon reaching the northbound destinations applicant has endeavored to obtain return shipments of any available commodities. While it is true that applicant has not continuously transported a wide variety of commodities southbound, we are of the opinion that its southbound operations have been reasonably consistent with its undertaking to transport general commodities, with the usual exceptions."

332

The company first contends that the Commission based its denial of authority to transport general commodities northbound upon the finding above quoted to the effect that even if the northbound operations prior to 1939 were consistent with the claimed holding out of the company to transport general commodities, it has not so operated since that time because from 1938 to 1942, the shipments of canned goods and seafood constituted from 90 to 98.5 per cent of the northbound shipments. The company says that its operations during these years were restricted by the terms of a compliance order of the Commission of April 29, 1938, which limited the northbound operations whereas prior to the effective date of that order and subsequent to its expiration on November 13, 1941, the operations were in accord with a general holding out.

It will be noticed that this argument relates only to the period after April, 1938, and is relevant only to the question whether the continuity of operations since the critical date of June 1, 1935, required by the statute has been shown. The argument has no bearing on the conditions prevailing on the critical date which the applicant must show in order to receive a certificate under the "grandfather" clause. To show that these operations were more far reaching than the Commission found and therefore required a broad grant of authority to transport general commodities northbound, the company relies upon the oral testimony of its president.

This testimony was not supported by records for no records were in existence and as it depended upon the memory of the witness with respect to transactions nearly eight years past, it was necessarily vague and general in its terms. In substance the witness said that his company held itself out as a common carrier of general commodities on June 1, 1935, as well as before and after that date; that it never refused any commodities; that it was not a special carrier for northbound goods but transported miscellaneous traffic in that direction, including chickens and poultry, dressed and alive, especially at Thanksgiving and Christmas; that it carried pearl essence, a substance manufactured from fish scales, and also pulleys, shafting and motors, as well as bowls, aprons and war baskets and light machinery at the end of the canning season. At one point in his testimony the witness said that the company carried northbound one hundred different commodities which included those used by canneries on the Eastern Shore of Maryland in their operations during the canning season.

Undoubtedly this testimony had some tendency to show that the Trucking Company's northbound traffic was not confined entirely to seafood and canned goods, but we cannot say that there was no reasonable basis for the Commission's conclusion that the proof did not measure up to the requirements of the statute. The oral testimony did not disclose the volume of the northbound traffic handled by the Trucking Company on the critical date. There was nothing to show that the commodities carried, other than seafood and canned goods, constituted a larger percentage of the whole than they did in subsequent years, or indeed that they were not so negligible as to be disregarded. While the Commission did not make a specific finding to this effect, as it might well have done in the interest of clarity and precision, it is evident that the Commission held this view, and since it had authority to determine the probative value of the evidence, its ultimate conclusion that the evidence did not constitute a sufficient basis for the grant of the desired certificate must be sustained.

We do not hold that a general carrier of goods is in all cases necessarily limited to the particular kinds of commodities which it was accustomed to transport on the critical date. There is evidence in the pending case relating to economic conditions on the Eastern Shore of Maryland from which it may be inferred that commodities are now offered for motor transport that were not produced in that locality in 1935. We think that a certificate issued by the Commission to a carrier of general commodities under the "grandfather" clause would authorize the carrier to transport such new goods although it had never done so before. In United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 483, 484, 486, 62 S.Ct. 722, 727, 728, 86 L.Ed. 971, the Supreme Court in discussing a question of this sort said:

"* * * It is plain that a carrier's holding out and actual performance may be limited to a few articles only. That is to say he may be a common carrier only of a restricted number of commodities. * * * Or the service actually rendered may have been confined to such a few commodities that his holding out or willingness to carry

a much larger class may be disregarded. * * * On the other hand, if the applicant has carried a wide variety of general commodities, he cannot necessarily be denied the right to carry others of the same class merely because he never carried them before. And where he has carried a wide variety of general commodities, he cannot necessarily be restricted to those which he carried with more frequency and in greater quantities than the others. * * * The Commission may not atomize his prior service, product by product, so as to restrict the scope of his operations, where there is substantial evidence in addition to his holding out that he was in 'bona fide operation' as a 'common carrier' of a large group of commodities or of a whole class or classes of property." 315 U.S. at pages 483, 484, 62 S.Ct. at page 727, 86 L.Ed. 971.

"* * * If the applicant had established that it was a 'common carrier' for a group of commodities or for an entire class or classes of property and was in 'bona fide operation' during the critical periods in a specified territory, restrictions on commodities which could be moved in any one direction or between designated points would not be justified. The fact that a particular commodity had never been transported between certain points in that territory would not mean that authority to haul it between them should be withheld." 315 U.S. at page 486, 62 S.Ct. at page 728, 86 L.Ed. 971.

■ But the difficulty which confronts the carrier in the present case is the lack of convincing proof that it was actually engaged in the transportation of general commodities in 1935. The character of the proof necessary to establish a historic basis for the grant of the privilege under the "grandfather clause" is thus described in United States v. Carolina Freight Carriers Corp. supra, 315 U.S. at pages 480, 481, 62 S.Ct. at page 726, 86 L.Ed. 971:

"The Act provides the test of 'bona fide operation'. That standard carries the connotation of substantiality. It also makes clear that a holding out to serve a specified area is not alone sufficient. It is 'actual rather than potential or simulated service' which is required. * * * Substantial, as distinguished from incidental, sporadic, or infrequent, service is required. Substantial service actually rendered may have been confined to narrow limits. * * * the Commission in determining the precise territory which may be served by a particular carrier cannot be unmindful of its responsibility to coordinate the various transportation agencies which constitute our national transportation system. * * * This does not mean that the right to the statutory grant may be withheld or cut down because the Commission disapproves of the competitive conditions which may be created if the application is granted. But its responsibility to bring greater order and stability to the transportation system than had earlier obtained * * * is an additional reason for its insistence upon a showing of substantial service in that territory which is sought to be covered by a certificate under the 'grandfather clause'."

■ The Trucking Company also contends that the Commission erred in restricting its grant so as to exclude authority to transport general commodities from Philadelphia to certain points on the Eastern Shore of Maryland, notwithstanding the finding of the Commission that the Trucking Company was engaged in such transportation on the critical date. The exclusion was made because the Trucking Company on May 12, 1943, while its "grandfather" proceeding was pending, purchased from one Henry J. Plant, with the approval of the Commission, the right which had been previously granted to Plant on May 2, 1943, under a "grandfather" application to transport general commodities from Philadelphia to points on the Eastern Shore. The purchase was made by the Trucking Company to safeguard itself against the possibility of unfavorable action on its own "grandfather" application. In its report the Commission stated that it made the exclusion in order to prevent duplication. The plaintiff takes the position that this action was erroneous since the Commission has no authority or discretion to prohibit or restrict the activities of a carrier, in which it was engaged on June 1, 1935 and in which it has been engaged since that date; and the plaintiff says that the practical effect of the Commission's action in the pending case is to destroy a property right which the plaintiff purchased for a substantial sum of money with the Commission's approval and which it now desires to sell. Furthermore the plaintiff contends that the action of the Commission will deprive it of its property without due process, because the point of duplication was not raised in the proceeding before the Commission and the plaintiff was given no opportunity before the decision either

to present evidence to show that the holding of duplicate rights would be in the public interest or to argue the matter on its merits.

This action of the Commission seems to involve injustice to the carrier until one is acquainted with the uniform practice of the Commission in issuing certificates to avoid the grant of duplicate rights to a carrier, a practice well established when the Trucking Company made the purchase from Plant in 1943. It was then well known that if the Trucking Company should be successful in its application for "grandfather" rights, it would not be permitted to hold duplicate rights under the Plant certificate and under its own application. The purchase was made with knowledge of this contingency, for the cases previously decided by the Commission show that the practice had been uniform and persistent. See, Reinhardt Transfer Common Carrier Application, 34 M.C.C. 423; Southeastern Greyhound Lines Common Carrier Application, 41 M.C.C. 153; Pennsylvania Truck Lines, Inc: Common Carrier Application, 41 M.C.C. 607; Hugh Breeding Transport, Inc. Common Carrier Application, 27 M.C.C. 473; Motor Exp. & Term Corp. Common Carrier Application, 31 M. C.C. 441; C. A. Conklin Truck Line, Purchase, 37 M.C.C. 467.

The Trucking Company points out that in some of these cases a merger of the rights of the applicant under the "grandfather clause" with rights acquired from another carrier had been made with the approval of the Commission prior to its action on the "grandfather" application, and that in other cases the prior purchase of another carrier's rights had been approved on the express condition that when the "grandfather" application should be determined, duplicate rights would be eliminated; and it is said that the absence of similar circumstances in the pending case indicates that the Commission had no power to cut down the Trucking Company's "grandfather" rights, and that in any event the Commission has not considered whether the holding of duplicate rights in this case would be in the public interest.

▉▉▉▉ There are cases, however, in which duplication has been denied under circumstances which do not differ in principle from the case at bar. See, Southwestern Transportation Co. Purchase, 35 M.C.C. 436, 442, 443; I. Becker & Sons, Inc., 31 M.C.C. 623–4; Savin Common Carrier Application, 41 M.C.C. 185; Bush Transfer v. United States, D.C.W.D. N.C., 53 F.Supp. 640. Moreover, we think that the Commission's action herein was in harmony with the spirit of the Act and the powers therein conferred upon it. Under Title 1, § 7 of the Act of September 18, 1940, Ch. 722, 54 Stat. 905, 49 U.S.C.A. § 5(2) (a), power is lodged in the Commission to approve, on terms which it deems consistent with the public interest, the consolidation or merger of properties of two or more carriers or the purchase by one carrier of the properties of another. Some of the cited cases in which the duplication of rights has been denied have involved the exercise of these powers in connection with "grandfather" applications; and the exercise of control by the Commission under such circumstances is proper because it cannot be supposed that the Commission has no jurisdiction over the unification of separate properties into one ownership which occurs when "grandfather" rights are granted to one who has acquired duplicate rights from another carrier during the pendency of the proceeding. Doubtless it is better practice for the Commission to give notice in its approval of the purchase of the property during the proceeding that in the event of favorable action on the "grandfather" application, duplication of rights will be eliminated; but even if the express warning is omitted, the condition is implicit in view of the Commission's statutory power of control. This view is reinforced by the power conferred upon the Commission in § 208(a) of the statute, 49 U.S.C.A. § 308(a), which provides that at the time of the issuance of a "grandfather" certificate and from time to time thereafter there shall be attached to the exercise of the privileges granted by the certificate such reasonable terms, conditions and limitations as the public convenience and necessity may require.

Some of the reasons which have led the Commission to deny a carrier the privilege of holding duplicate rights until the carrier sees fit to transfer them, are shown in the following quotations from the Commission's report in Southwestern Transp. Co. Purchase, 35 M.C.C. 437, 442, 443:

"Acceptance of the view that operating rights may be indefinitely removed from active use and preserved in existence for subsequent transfer and vitalization in an additional motor carrier when, perhaps, competitive conditions or the traffic potentiali-

ties of a given territory have materially changed, would be inconsistent with the public interest, would not foster sound economic conditions in the industry, and would be incompatible with the policy declared in § 202(a) of the Act." 35 M.C.C. at page 442.

"As indicated in the foregoing quotation, we have uniformly viewed the consummation of a purchase, merger, or consolidation transaction authorized under § 213 as automatically, and by virtue of the nature of the transaction itself, effecting physical unification of the properties, theretofore in separate ownership and operation, into a single ownership and operation. In connection with the contention that denial of the existence of two separate duplicate rights in Johnson would result in revocation of an operating right in a manner other than as provided in § 212(a), it might be observed that authority granted under § 213 is permissive only, that rights of parties to a unification transaction under that section are not revoked, but merged along with other properties, and that such merger is accomplished automatically by reason of the voluntary act of the parties in consummating the transaction, and not by any 'requirement' of ours. It is apparent that revenue from freight shipped, formerly shared by the separate operators, accrues to the single operator after the unification." 35 M.C.C. at page 443.

 We do not agree with the carrier's contention that it has had no opportunity to present its point of view to the Commission and that the Commission has never considered in this case whether the existence of duplicate rights would be inconsistent with the public interest. It is true that the point of duplication does not appear to have been raised in the proceeding before the Commission rendered its decision, but it was argued by the applicant in its subsequent brief filed with the Commission in connection with its motion for reconsideration, and it has been fully briefed and argued in this court. The plaintiff makes no argument and offers no proof to show that its possession of duplicate rights would actually serve the public interest. They are desired only that they may be sold. Under these circumstances, it would be futile to remand the case to the Commission for further consideration, especially as its views on the subject have been so frequently and so forcefully expressed.

 Finally, plaintiff contends that the Commission wrongfully refused to receive evidence tending to show that the public convenience and necessity would be served by the issuance of the certificate prayed for, even though the evidence did not demonstrate the existence of "grandfather" rights. There was no error in this ruling. The plaintiff's application was based on the "grandfather" clause contained in § 206(a) of the Act and related to the applicant's activities in the past. It was not framed under § 207(a) of the Act which requires evidence that the present or future public convenience and necessity will be served by the proposed grant. Under these circumstances it was entirely within the discretion of the examiner and of the Commission to refuse the proffered evidence. United States v. Maher, 307 U.S. 148, 156, 59 S.Ct. 768, 83 L.Ed. 1162; Transamerican Freight Lines v. United States, D.C., 51 F.Supp. 405; Philadelphia-Detroit Lines v. United States, D.C., 31 F.Supp. 188, 190; cf. McCracken v. United States, D.C., 47 F.Supp. 444; Chicago, St. P. M. & O. Ry. Co. v. United States, 322 U.S. 1, 64 S.Ct. 842, 88 L.Ed. 1093. The decision in the pending case does not close the door upon the applicant, and if it desires to acquire rights more extensive than it has been found to be entitled to under the "grandfather" clause, it may still file an application under § 207(a) of the Act for a certificate of public convenience and necessity.

For the reasons stated, the injunction applied for will be denied and the complaint of the plaintiff will be dismissed.