**MOTOR FREIGHT EXPRESS**

**v.**

**UNITED STATES et al.**

**Civ. A. No. 4789.**

United States District Court
M. D. Pennsylvania.

Feb. 17, 1954.

McNees, Wallace & Nurick, Jefferson Barnhart, Harrisburg, Pa., for Motor Freight Express and others, plaintiffs.

J. Julius Levy, U. S. Atty., Scranton, Pa., John Guandolo, Sp. Asst. to Atty. Gen., for the United States, defendant.

Leo H. Pou, Edward M. Reidy, Chief Counsel, Washington, D. C., for Interstate Commerce Commission, defendant.

John M. Musselman, of Rhoads, Sinon & Reader, Harrisburg, Pa., Clarence Todd, Dale C. Dillon, Washington, D. C., for Branch Motor Express Co., intervenor.

Before STALEY, Circuit Judge, WATSON, Chief Judge, and MURPHY, District Judge.

STALEY, Circuit Judge.

This court was convened to hear and determine the merits of plaintiffs' claim that two orders of the Interstate Commerce Commission should be set aside.[1] One of the orders was dated March 17, 1952, and issued after a "grandfather" application proceeding at the commission's Docket No. MC–10875. The other was dated December 19, 1952, and resulted from two complaint proceedings at Docket Nos. MC–C–1322 and MC–C–1351. On November 25, 1953, we denied a preliminary injunction. We now decide that there is no fatal infirmity in the challenged orders and that they may not be set aside.

The orders concern the scope of operating authority of Branch Motor Express Company, a common carrier by motor vehicle. Branch intervened and has taken part in the proceedings.[2] Plaintiffs are ten motor carriers who compete with Branch at the points in dispute.

None of the testimony that was taken before the commission was put into evidence here. Therefore, we take the background facts from the trial examiner's report and those of the commission. The history of the litigation is rather involved and goes all the way back to 1936.

On February 10, 1936, Branch[3] filed with the commission two applications under the "grandfather" provisions of Sections 206(a) and 209(a) of Part II of the Interstate Commerce Act. The application under Section 206(a).[4] of the Act sought a certificate of public convenience and necessity to operate as a motor common carrier of general commodities over certain specified regular routes. At its MC–10875, the commission conducted an informal investigation on this application and, on June 10, 1938, entered a compliance order providing for the issuance to Branch of a grandfather certificate to operate as a motor common carrier of general commodities, with certain immaterial exceptions, and excepting "garments, and materials and supplies used in the manufacture" thereof, over the routes and serving the points requested in the application, including the terminal points and principal intermediate points named, but not specifically including the highway junction points and all intermediate points.

The other application, under Section 209(a),[5] was docketed as MC–10876 and

---

1. 49 Stat. 548 (1935), as amended, 63 Stat. 479 (1949), 49 U.S.C.A. § 305(g) (1951); 28 U.S.C. §§ 1336, 1398, 2321, 2325, and 2284.

2. 28 U.S.C. § 2323.

3. Then called Branch Storage Company, Inc. The name was changed to Branch Motor Express Company on November 13, 1939.

4. "Certificate of convenience and necessity —(a) Necessity for; carriers in bona fide operation on June 1, 1935; traffic moving to and from Territories and possessions; 'grandfather' provisions
"(1) Except as otherwise provided in this section and in section 310a of this title, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operation on any public highway, * * * unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: *Provided, however,* That, subject to section 310 of this title, if any such carrier

or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, * * * the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation * * *." 49 Stat. 551 (1935), as amended, 64 Stat. 574 (1950), 49 U.S.C.A. § 306(a) (1951).

5. "Contract carriers by motor vehicle— (a) Permit to operate; carriers in bona fide operation on July 1, 1935; * * * traffic moving to and from Territories and possessions; 'grandfather' provisions
"(1) Except as otherwise provided in this section and in section 310a of this title, no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway * * * unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business: *Provided,* That, sub-

sought a grandfather permit to operate as a contract carrier of garments between the points applied for in the common carrier application. The matter was put down for hearing, following which the trial examiner issued his report and recommended order. On May 17, 1941, no exceptions having been taken to the examiner's recommended order, it became effective as the order of the commission, authorizing Branch to operate as a common, rather than a contract, carrier of garments. Hence, a certificate was granted to Branch to continue its garment carriage between certain specified points. In June of 1942, the commission issued to Branch a consolidated certificate whose separate paragraphs authorized the operations set out in the orders at MC–10875 and MC–10876.

Branch next appeared before the commission in 1944 and petitioned to reopen the proceedings at both docket numbers in order to determine whether it should be authorized to operate as a common carrier of garments from, to, and between all of the points on the routes as to which it had been authorized to haul general commodities. No exceptions having been taken to the examiner's recommended order, it became effective as the order of the commission. On April 23, 1945, a corrected certificate was issued to Branch which authorized the extended scope of operation requested in Branch's petition. This was the certificate held by Branch when the proceedings were begun which precipitated the present dispute. It did not, nor did any of the prior certificates, specifically list the cities of York and Lancaster, Pennsylvania, among the intermediate points at which Branch was authorized to render service on its Baltimore-Reading routes.

In February of 1950, Branch petitioned for "correction, clarification, reconsideration, or revision" of its certificate. Specifically, it sought a determination that it was entitled to serve all the intermediate points on its authorized routes. The proceeding was opened and a further hearing took place. Motor and rail carriers appeared in opposition, and much evidence was received. From the examiner's and the commission's reports we learn that Branch's 1950 petition for clarification asserted that it had always considered that its certificate authorized service at all intermediate points on its regular routes, whether or not listed therein; that it has, in fact, served all such points since long prior to the grandfather date; but that it had been advised in 1949 that its certificate may not have authorized service at those intermediate points on its regular routes which were not specifically listed; and that, if such were the case, the certificate was faulty. Consequently, it sought a revision which would definitely state that the service at all intermediate points was authorized. In effect, it claimed no new intermediate-point service rights but asked that the commission specifically approve what it alleged it had been doing since before June 1, 1935.

After canvassing the entire record, the examiner stated:

"The evidence adduced at the further hearing is not sufficient of its own weight alone to support applicant's present claims. * * *

"Though the recorded evidence at further hearing is not sufficient, the issues in the proceeding are such that resort must and should be had to the basic 'grandfather' application in order to reach a determination. * * * "

He said that the certificate revealed duplicity, ambiguity and confusion. Re-

ject to section 310 of this title, if any such carrier or a predecessor in interest was in bona fide operation as a contract carrier by motor vehicle on July 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, * * * the Commission shall issue such permit, without further proceedings * * *." 49 Stat. 552 (1935), as amended, 64 Stat. 575 (1950), 49 U.S.C.A. § 309(a) (1951).

ferring then to the original grandfather application, he noted that, following each route description was a list of "principal intermediate points," among which were not listed the terminal points of the individual highway segments as named in the route description. Attached to the application, however, was the following statement:

"Wherever in the following route descriptions the expression 'principal intermediate points' is used it should be understood that included therein are also the junction points between highways which are shown * * *"

He felt that this analysis supported Branch's claimed intent to continue service at all highway segment terminal points as well as named intermediate points, even though those highway segment terminal points were not listed among the intermediate points in the certificate. Lancaster and York were among such highway segment terminal points on Branch's Reading-Baltimore Route No. 38. The examiner then noted that the commission had never required all-inclusive evidence of intermediate-point service in grandfather applications. His ultimate finding followed the statutory formula to the effect that Branch was on June 1, 1935, and continuously since that time has been, in bona fide operation as a common carrier serving *all* the intermediate points on the described routes.

Upon exceptions by the protestants, Division 5 of the commission thoroughly reviewed all the evidence. Its report of March 17, 1952, states that Branch had always considered that it was authorized to serve all intermediate points and that its certificate does not reflect all the operating rights established by Branch and to which it is entitled. Regarding the examiner's resort to the grandfather application, it said that statements therein have no probative value but that the application must be considered in order to ascertain the scope of the claimed grandfather rights. As to Branch's burden of proof, it said that the testimony was too

indefinite to establish grandfather rights at any of the intermediate points not then specifically authorized, but it then adverted to its rule that, in order to obtain authority to serve all intermediate points on a regular route, a grandfather applicant need not show service at every point. If a sufficient number of intermediate points have been served, authority to serve all points should be granted. There followed its ultimate finding that Branch was, on June 1, 1935, and continuously since has been in bona fide operation as a motor common carrier over the routes and in the manner set out in its appendix C, which authorized service at all intermediate points, with exceptions not here material. This, of course, authorized service at Lancaster and York on Branch's Baltimore-Reading routes. The full commission denied petitions for rehearing, and, on May 4, 1953, a revised certificate issued to Branch, authorizing the service set out in the order of March 17, 1952.

The other order attacked issued after two complaint proceedings were instituted against Branch by two of the present plaintiffs. The complaints were that Branch had rendered service at York and vicinity in violation of its 1945 certificate. In an order issued on December 19, 1952, Division 5 of the commission stated that the operations complained of were unauthorized at the time performed, but it declined to issue cease and desist orders because, since that time, Branch's certificate had been revised so that those operations were now authorized. Division 5 then discontinued the proceedings. On July 1, 1953, the full commission denied a petition for reconsideration.

A few preliminary matters should be disposed of at this point in order properly to focus the scope of the issues here.

Since we uphold the commission's action on Branch's application proceeding, we will not again refer to the complaint proceedings, for the validity of the latter turns entirely on that of the former. That is, the commission may not be reversed for declining to issue cease and

·desist orders against operations that, at the time of the orders, are clearly within the authorization of the erstwhile violator.

■■ Moreover, since plaintiffs have not introduced the transcripts, of testimony containing the evidence upon which the commission made its findings of fact, we must conclude that those findings are supported by substantial evidence on the record considered as a whole. "The settled rule is that the findings of the Commission may not be assailed upon appeal in the absence of the evidence upon which they were made." Mississippi Valley Barge Line Co. v. United States, 1934, 292 U.S. 282, 286, 54 S.Ct. 692, 693, 78 L.Ed. 1260.

■ It is understood, of course, that we do not sit de novo in cases dealing with orders of the commission. On the contrary, the scope of review is limited by the doctrine of administrative finality. "Only questions affecting constitutional power, statutory authority and the basic prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable." Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 140, 59 S.Ct. 754, 762, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, supra.

■ Plaintiffs, conceding the validity of the rules stated in the two preceding paragraphs, rely upon the well-established principle of administrative law to the effect that the agency's ultimate finding, usually expressed in the statutory language, must find adequate support in its findings of basic facts. United States v. Carolina Freight Carriers Corp., 1942, 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971; United States v. Chicago, M., St. P. & P. R. R., 1935, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023. The problem usually found in cases discussing the question of the adequacy of basic findings to support the agency's ultimate finding is that, without a reasonably clear exposition of the agency's basic findings, the court is unable intelligently to exercise its reviewing function or cannot be sure that the agency has not gone beyond its jurisdictional power or has not departed from its statutory authority. That is not our problem. From an examination of the commission's order, we are not left with any doubt as to what the commission has done and why it has done so. Our problem, then, is to determine whether there is statutory authority for revising a grandfather certificate upon the basis of the factors which the commission employed in this case.

■ An applicant for a grandfather certificate need not prove public convenience and necessity; he is entitled to a certificate, as a matter of right, upon proof of substantial bona fide operations on and continuously since the statutory date. Gregg Cartage & Storage Co. v. United States, 1942, 316 U.S. 74, 62 S. Ct. 932, 86 L.Ed. 1283; United States v. Carolina Freight Carriers Corp., 1942, 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971; McDonald v. Thompson, 1938, 305 U.S. 263, 59 S.Ct. 176, 83 L.Ed. 164. Thus, when Branch acquired its original certificate, it did so upon the basis of sufficient pre- and post-statutory operation, regardless of the question of public convenience and necessity. Plaintiffs contend that the same rules should govern the disposition of Branch's 1950 petition for clarification of its grandfather certificate, that is, that the burden was on Branch to show substantial operations at Lancaster and York on its Baltimore-Reading routes, on and continuously since June 1, 1935. This, according to plaintiffs, Branch failed to do, because both the examiner and the commission found that the evidence was insufficient to support Branch's claimed right to a grandfather certificate authorizing service at Lancaster and York. With that as a basic finding, it is said that the commission cannot, consistently with logic, make the required, ultimate finding that Branch has served Lancaster and York, on its Baltimore-Reading routes, on and since the statutory date. Therefore, the order must be set aside.

■ We disagree. It is true that the examiner and the commission stated, in effect, that the evidence of Branch's operations adduced at the 1950 hearing in and of itself was insufficient to establish its right to grandfather authorization at each of its intermediate points. The commission went on, however, to its rule that, in order to obtain authority to serve all intermediate points on its regular route, it is not necessary that a grandfather applicant show service at every point, but if a sufficient number of such points have been served, authority to serve all should be granted. That rule is the heart of this case, and there is no doubt of its applicability here, for the commission found that of a total of 430 intermediate points on the 42 routes described in Branch's 1945 certificate, service was specifically authorized at 76 per cent of them, and that the evidence at the further hearing showed sufficient operations at 17 more, or 80 per cent of them. Since the testimony is not before us, we must take those findings at their face value. Indeed, plaintiffs do not dispute the validity of those findings. We turn then to whether that rule and its use here is within the commission's statutory authority. If it is, the ultimate finding is adequately supported and cannot be set aside.

We think that what the commission did here and has done before, Riss & Co., 44 M.C.C. 704 (1945); Richards, 27 M.C.C. 489 (1941); Pierce Auto Freight Lines, 11 M.C.C. 417 (1939), is no more than what courts do every day. Reduced to its essentials, the so-called rule in question is no more than an inference based upon probabilities of fact. It is a shorthand expression of a process of reasoning. The commission, as the fact finder and upon substantial evidence on the whole record, determines that a carrier has been operating over a particular route since the early thirties, serving as a common carrier of general commodities at a certain number of intermediate points on that route and, consistent with natural business aggression, has attempted to carry all that is offered to and from all the points on that route. Its direct, positive evidence, however, at a hearing held fifteen years after the statutory date, is sufficient to prove definite service at only a certain number of the points on the route. The rule in question then comes into play and is a tacit statement by the commission to the effect that, since the applicant has operated over this route for a long time and has definitely proved service at a number of points, we will infer that it has served all points. Plaintiffs' supplemental brief seems to concede the propriety of drawing such an inference. Complaint is made, however, that it is not properly drawn in a case where the commission has made an express finding that the points were not served. That may be, but we need not decide such a question because here the commission made no such finding. It found that Branch's evidence adduced in 1950 was too indefinite to establish grandfather rights at the disputed points; that the witnesses did not recall specifically shipments from Baltimore over any direct route to the points in question. It did not find that there were no such shipments. It should be pointed out that a flood in 1944 had destroyed Branch's records so that it could not produce documentary evidence of pre-1944 shipments.

■ We think the commission's use of this logical inference from well-established facts is perfectly consistent with the admonition that, within certain limits, it will be left to work out by its expert judgment the specific variations of the general grandfather authority in order to assure those regulated "that substantial parity between future operations and prior *bona fide* operations which the statute contemplates." Alton R. R. v. United States, 1942, 315 U.S. 15, 22, 62 S.Ct. 432, 437, 86 L.Ed. 586. In United States v. Carolina Freight Carriers Corp., 1942, 315 U.S. 475, 480, 62 S.Ct. 722, 726, 86 L.Ed. 971, it was said that "The precise delineation of the area or the specification of localities which may be serviced has been entrusted by the Congress to the Commission." The com-

mission's judgment was characterized as "highly expert. Only where the error is patent may we say that the Commission transgressed." 315 U.S. at page 482, 62 S.Ct. at page 726.

■ The question of the power of an administrative agency to draw inferences from proven facts was settled by Republic Aviation Corp v. National Labor Relations Board, 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. "An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration. * * * Like a statutory presumption or one established by regulation, the validity, perhaps in a varying degree, depends upon the rationality between what is proved and what is inferred." 324 U.S. at pages 800, 804–805, 65 S.Ct. at page 986. Here there is obviously sufficient rational connection between what the commission found to have been proved and what it inferred.

■ Plaintiffs argue that, assuming the propriety of the inference, its application here is not consistent with its use in past decisions by the commission. But an agency may change its mind. If the application of the inference here was not improper, we may not be concerned that it may have been applied differently in other cases before the commission. Federal Communications Commission v. WOKO, Inc., 1946, 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204; Virginian Ry. v. United States, 1926, 272 U.S. 658, 665–666, 47 S.Ct. 222, 71 L.Ed. 463.

■ We are told that error was committed by the reference to Branch's orig-inal grandfather application. The order, read as a whole, however, convinces us that the application was alluded to only to set the scope of the issues before the commission and to show the obvious justification for Branch's asserted assumption that its original certificate authorized service at the now disputed points.

■ Nor do we think that Branch can be charged with such laches as to deprive the commission of power to act in this case. One can hardly be said to have delayed unreasonably in acquiring rights which he justifiably believed he had acquired years ago. Branch's clarification petition was filed shortly after its operating rights were questioned.

We conclude that the commission acted within its statutory authority and that there is a rational basis for its order. Therefore, the complaint will be dismissed.