The **GEORGE A. RHEMAN COMPANY** and J. C. Hagler, Jr., and T. W. Hagler, a partnership, doing business as Hagler Truck Company, Plaintiffs,

v.

**UNITED STATES** of America and the Interstate Commerce Commission, Defendants.

Civ. A. No. 4962.

United States District Court
E. D. South Carolina.

Argued June 27, 1955.

Decided July 27, 1955.

Frank A. Graham, Jr., Columbia, S. C., and Frank B. Hand, Jr., Washington, D. C., for complainants.

N. Welch Morrisette, Jr., U. S., Atty., Columbia, S. C., Stanley N. Barnes, Asst. Atty. Gen., and James E. Kilday and John H. D. Wigger, Sp. Assts. to Atty. Gen., for the United States.

Samuel R. Howell, Acting General Counsel, Washington, D. C., and James Y. Piper, Asst. General Counsel, for Interstate Commerce Commission.

T. Allen Legare, Jr., Charleston, N. C., and James B. Craighill, Charlotte, N. C., for intervenor Greater Charleston Chamber of Commerce.

Before PARKER, Circuit Judge, and WARLICK and WILLIAMS, District Judges.

PARKER, Circuit Judge.

This is an action by two common carriers by motor vehicle to enjoin and set aside an order of the Interstate Commerce Commission, being the tenth order in Ex parte No. MC–37, entered December 15, 1954, redefining and extending the commercial zone of the City of Charleston, South Carolina. 63 M.C.C. 127. The contention of plaintiffs is that the entry of the order was not a proper exercise of the rule making power of the Commission under section 4 of the Administrative Procedure Act, 5 U.S.C.A. § 1003, and that it was void because an adjudicatory hearing was not held in accordance with section 5 of that act. 5 U.S.C.A. § 1004. A court of three judges has been constituted as required by statute, hearing has been had upon the record made before the Commission and the case has been submitted for final decree.

Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq., confers upon the Interstate Commerce Commission power to regulate common carriers by motor vehicle operating in interstate or foreign commerce. The effect of sections 202(c) and 203(b) (8) of the Act, 49 U.S.C.A. §§ 302(c) and 303(b) (8), " * * * is partially to exempt from regulation under part II of the act all purely local motor transportation, in interstate or foreign commerce, within municipalities or within the commercial zones thereof, and partially to exempt from direct regulation under part II similar local operations, namely, transfer, collection and delivery performed within the 'terminal areas' of line-haul carriers in connection with some intercity or intercommunity line-haul service." Commercial Zones and Terminal Areas, 54 M.C.C. 21, at page 50.

What was to be exempted under sections 202(c) and 203(b) (8) was not defined with particularity in the statute but was left to be covered by the rule making power of the Commission which was granted by section 204(a) (6) of the Act, 49 U.S.C.A. § 304(a) (6), which provides that it shall be the duty of the Commission "To administer, execute, and enforce all provisions of this chapter, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration". Cf. American Trucking Ass'ns v. United States, 344 U.S. 298, 312, 73 S.Ct. 307, 97 L.Ed. 337.

In 1946 the Commission established a uniform population mileage formula for defining the commercial zones of all municipalities in the United States, except for a few cities the commercial zones of which had theretofore been individually defined. See Ex parte No. MC–37, Commercial Zones and Terminal Areas 46 M.C.C. 665. In its Third Supplemental Report in Ex parte No. MC–37, 48 M.C.C. 418, the Commission, interpreting section 203(c)(2) of the Act, found the "terminal areas" of motor carriers subject to its jurisdiction to be co-extensive with the commercial zones of the cities authorized to be served by them. In its Sixth Supplemental Report in Ex parte No. MC–37, 54 M.C.C. 21, the Commission elaborated its previous finding somewhat and found that a certificate or permit issued by it to a motor carrier, authorizing service at a particular municipality, should be construed as authorizing service at all points within the commercial zone of such municipality as defined by the Commission, but not beyond the territorial limits (if any) fixed in such certificate or permit.

The City of Charleston is situated on the southern end of the narrow peninsula formed by the confluence of the Ashley and Cooper Rivers. Due to the peculiar geography of its site, the growth of the city, both commercial and residential, has been up the peninsula and beyond its northern corporate limits, which have not been changed since 1849. Under the MC–37 formula the commercial zone of the City of Charleston embraced the municipality itself, all unincorporated areas within four miles of its corporate limits, and all of any other municipality any part of which lay within four miles of the corporate limits of Charleston. Much of the more recent industrial growth of the area has been outside that zone and particularly along the Cooper River, where new port facilities have been built.

The Greater Charleston Chamber of Commerce on May 5, 1954, filed with the Commission a petition asking that the Charleston commercial zone be enlarged to include unincorporated areas within a radius of 15 miles from the midpoint of the northern corporate boundary of the city. The apparent object of the Chamber of Commerce was to obtain an increase in interstate motor carrier service available to the rapidly developing industrial areas and port facilities lying outside the present commercial zone. This petition was referred by the Commission to its field representative at Columbia, S. C. He gave some 193 parties, representing shippers, carriers operating in the area, and others, notice of a conference to be held with regard to the re-

quested extension. At this conference, held in Charleston on June 22, 1954, some 39 persons appeared, including representatives of plaintiffs herein.

Based on information obtained at this conference and through field surveys, and acting pursuant to section 4(a) of the Administrative Procedure Act, 5 U. S.C.A. § 1003(a), the Commission on July 30, 1954, issued a "notice of proposed rule making", describing the boundaries of the Charleston commercial zone as it proposed to extend them, the extensions being much less than those proposed by the Chamber of Commerce. The notice was published in the Federal Register, 19 Fed.Reg. 4882 (August 4, 1954), and copies were served on all persons who had attended the June conference. It stated that no oral hearing would be held, but that data, views, arguments, and information on the proposed revisions would be received in writing up to September 15, 1954. Of the four responses, two supported the proposed revision and two were opposed, one of the latter being filed by plaintiffs.

On December 15, 1954, Division 5 of the Commission issued the Tenth Supplemental Report in Ex parte No. MC–37, 63 M.C.C. 127, and the order which is here under attack. The Commission made findings of fact as to the commercial and industrial growth of the area which it proposed to include within the commercial zone, as follows:

"Since the 1940's a great increase in population and in commercial and industrial activity has taken place in the immediate area of Charleston. During this period, the South Carolina State Ports Authority has been instrumental in developing the port facilities. These facilities, together with the Navy Yard, extend from the southernmost tip of the peninsula to a terminal located approximately 2 miles north of the commercial zone limits as presently defined. When shipments are consigned to the Port of Charleston, it is often impossible to determine whether they will be discharged at piers within or without the presently defined zone. All of the port activities are directed by a single management.

"Some 22 industrial establishments are located outside the presently defined limits but within the zone limits proposed by our notice. These industries are served by motor and rail carriers at the same rates as those in the City of Charleston. In instances where consignees are located outside the presently defined commercial zone, it is, however, often necessary to make transfer of lading at Charleston.

"It is estimated that more than 20,000 new families have moved into the Charleston area in the past four years, most of whom have settled in an area outside the presently defined zone limits but within the proposed limits. The present density of population in Charleston is such that most new residents have been forced to find homes outside the limits of the presently defined zone. Water for the new homes, commercial establishments, and industries is provided by the City of Charleston; nontoll local telephone service is provided; and electric lights and transit facilities are provided from Charleston.

"Others supporting the proposal include the South Carolina State Ports Authority, United Piece Dye Works, the 456th Troop Carrier Wing (M), and the Shell Oil Company. They, and others, have installations outside the presently defined zone limits but within those proposed, and each has had difficulties in shipping or receiving freight because of its location."

The contentions of the motor carriers who opposed the proposed extension were noted and dealt with, the Commission adhering to the position taken by it in St. Louis, Mo.-East St. Louis, Ill., Commercial Zone 61 M.C.C. 489, 493–494, and quoting therefrom as follows:

"In determining the limits of a commercial zone, we are directing our attention to an impersonal situation which exists as an economic fact, and not to the effect on individual parties. The effect of the exemption which it has established is the responsibility of the Congress. In essence the rail carriers' objection to the procedure followed in determining the territorial scope of the exemption is based on the fundamentally erroneous belief that such questions as the need for additional service in an extended commercial area, or the adequacy of existing transportation, are issues or even material in a proceeding of this character. In the original report in Commercial Zones and Terminal Areas, 46 M.C.C. 665, at page 672, the nature of the partial exemption was discussed as follows:

" 'Actually we do not "create" or "establish" any commercial zones, nor have we any power to "extend" any exemption. A commercial zone about each municipality, within which motor transportation of the kind contemplated by section 203(b) (8), is conducted, already exists by reason of trade practices, the uses to which the area is put, and geographical and political considerations. The existence of such zones is an economic fact. Within them, certain motor transportation of the kind contemplated by the statute is already partially exempt from regulation. Our function and purpose in this proceeding, as it relates to commercial zones, is simply to determine the limits of zones which already exist, so that all may know the limits of exemptions which now exist by reason of the action of Congress.'

"Clearly, the existence of a commercial zone is an economic fact and the partial exemption resulting therefrom is independent of any question of need for the exempted transportation, or the adequacy of existing services. The partial exemption provided by section 203(b) (8) may be removed at any time, as to any particular municipality, upon our finding that the application of all provisions of part II of the act to local transportation at such municipality is necessary to carry out the national transportation policy. Consideration of economic consequences is proper in considering whether the partial exemption should be removed at any municipality but has no place in determining in the first instance the factual issue as to the territorial limits of the commercial zone of that municipality."

The Commission found that the situation at Charleston is so geographically different from that at most places that the ordinary formula applied by it for determining the commercial zone of a city produces an illogical and inaccurate result. It refused to adopt the zone recommended by the Chamber of Commerce, but did adopt the zone as described in the Federal Register with one slight modification. A petition for reconsideration was denied by the full Commission.

Plaintiffs here are two motor carriers whose certificates of convenience and necessity permit them to serve Charleston including an area 10 miles to the north, which is included within the commercial zone established by the order here under review. Their grievance is that other carriers whose certificates were granted with Charleston as a terminal point will be allowed by the order to serve the additional territory to the north of Charleston and that they will, thus, be granted the right to operate without a finding of public convenience and necessity and without a hearing having been held to determine such extension of this authority. Two questions are raised by their contentions: (1) Whether it was proper for the Commission to enter the order in question under its rule making power; and (2) if so, whether the order could validly be

entered without affording the plaintiffs an adjudicatory hearing under sections 7 and 8 of the Administrative Procedure Act, 5 U.S.C.A. §§ 1006 and 1007. We think that both questions should be answered in the affirmative.

We think it perfectly clear that defining the limits of the commercial zone of the City of Charleston was exercise of the rule making power of the Commission, for which an adjudicatory hearing was not necessary, whether the purpose was to enlarge the zone exempt from regulation by sections 202(c) and 203(b) (8) of the Interstate Commerce Act or to enlarge the terminal area of motor carriers serving the City of Charleston. In either case the Commission was making what was clearly an "agency statement of general * * * applicability and future effect designed to implement, interpret, or prescribe law or policy * * *", within the meaning of section 2(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1001(c). It was taking action legislative in character, looking to the future and changing existing conditions "by making a new rule, to be applied thereafter to all or some part of those subject to its power". Prentis v. Atlantic Coast Line R. Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150; Bi-Metallic Inv. Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372; Bowles v. Willingham, 321 U.S. 503, 519–521, 64 S.Ct. 641, 88 L.Ed. 892; Willapoint Oysters v. Ewing, 9 Cir., 174 F.2d 676, 693. In the case last cited, the Court of Appeals of the Ninth Circuit, speaking through Judge Bone, lucidly pointed out the distinction between the rule making and the adjudicatory process in the following language:

"Rule-making is legislation on the administrative level, i. e., legislation within the confines (standard) of the granting statute as required by the Constitution and its doctrines of non-delegability and separability of powers. Section 2(c) of the Administrative Procedure Act, supra, defines rule-making as the 'agency process for the formulation, amendment, or repeal' of agency statements of:

"'general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy * * *.'

"This is not novel reasoning but an explanation of existing concept and must be so construed. The legislative process i. e., rule-making, is normally directed primarily at 'situ-actions,' rather than particular persons. Individual protestations of injury are normally and necessarily lost in the quantum of the greater good.

"Adjudication, defined by section 2(d) of the Administrative Procedure Act as any action other than rule-making but including licensing, comports with the judicial function. Its primary concern is with individual rights, liabilities for past conduct, or present status under existing law, and tends to be accusative and disciplinary in nature."

See also Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 210 F.2d 24, 27.

It is provided by 5 U.S.C.A. § 1003 (b) that, where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 1006 and 1007 of title 5 shall apply; but there is no such statutory requirement with respect to the exercise of rule making in determining commercial zones for cities or terminal areas for carriers. American Trucking Ass'ns v. United States, 344 U.S. 298, 319–320, 73 S.Ct. 307, 319, 97 L.Ed. 337. In the case cited, as here, rule making was exercised in accordance with section 204(a) (6) of the Motor Carrier Act; and there as here carriers adversely affected raised the objection that there had been no compliance with provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., relating to adjudicatory hearings. In holding that this was not nec-

essary, the Supreme Court, speaking through Mr. Justice Reed, said:

"* * * § 7 of the Administrative Procedure Act is limited by its own terms to 'hearings which section 4 or 5 requires to be conducted pursuant to this section'. Turning to those sections, it is found that they invoke § 7 only when specified by statute: 'Where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection.' In short, § 7 applies only when hearings were required by the statute under which they were conducted to be made on the record and with opportunity for oral hearing. As we have pointed out, the rule-making authority in the instant case stems from § 204(a) (6) of the Motor Carrier Act; nothing there requires record or hearing, in direct contrast with the rate-making procedure provisions of §§ 216(e) and 218(b)".

In Highland Farms Dairy v. Agnew, D.C., 16 F.Supp. 575, 586–587, affirmed 300 U.S. 608, 57 S.Ct. 549, 586, 81 L.Ed. 835, Judge Soper points out that an adjudicatory type of hearing is not necessary to the validity of a rule making proceeding. He said:

"The proceeding before the Milk Commission was not quasi judicial, but legislative. It is true that the act made provision for a public hearing without which the Commission was not authorized either to exercise its powers in any market area or to fix prices; but this hearing was to be of the same nature as that held by a legislative committee in considering proposed legislation. The act contains no directions as to the kind of notice to be given, and evidently merely contemplated notice by advertisement to the general public. No other notice was feasible, considering the large number of persons engaged in production and distribution of milk. The Commission was undoubtedly justified in the exercise of its legislative function in taking into consideration not only the facts presented at the public hearing, but those which came to it subsequently from interested parties or were disclosed by its own investigation into the facts and the literature bearing upon the subject."

The Commission has repeatedly held that the ordinary rule making hearing is all that is necessary in proceedings for enlargement of Commercial Zones and that parties adversely affected have no ground of complaint because the extension of a commercial zone extends, without an adjudicatory hearing to determine public convenience and necessity, the terminal area which may be served by a carrier. In Commercial Zones and Terminal Areas, No. MC–37, Sixth Supplemental Report, 54 M.C.C. 21, 79 et seq. the Commission said with respect to the problem presented:

"The objection most strenuously pressed against the indicated construction of motor-carrier operating authorities is the claim that it amounts, in many instances, to an extension of operating rights, or to a grant of additional authority, which is unlawful and beyond our power in the absence of findings, based on substantial evidence, that the extended operations are required by public convenience and necessity or will be consistent with the public interest and the national transportation policy. * * * The indicated construction is not an enlargement of operating rights or a wholesale grant of additional authority, but, rather, a much needed formal declaration as to the proper interpretation of outstanding authorities. As such, it is clearly within our power and duty to make."

And see St. Louis, Mo.-East St. Louis, Ill., Commercial Zone, 61 M.C.C. 489, from which we have quoted supra, and

Commercial Zones and Terminal Areas (New Orleans, La., Commercial Zone), 62 M.C.C. 151, where the Commission said:

"Specifically, the rail carriers contend that definition of the limits of the zone adjacent to and commercially a part of any particular municipality within the meaning of section 203(b) (8) of the act in the course of, or for the purpose of, administering that section is not a proper exercise of the Commission's 'rulemaking' authority. They concede that in a proper case of rulemaking there is no constitutional or statutory requirement of a hearing, but they insist that this proceeding involves their substantive rights and that accordingly the contemplated result amounts to an 'adjudication' rather than 'rulemaking.' Pointing to the fact that enlargement of the commercial zone will broaden the territory within which purely local operations may be conducted under the exemption provided by section 203(b) (8) of the act and which may be served by intercity motor carriers authorized to serve New Orleans, they declare that even though the extent of the commercial zone may be a fact already formed which needs only to be established, it is nevertheless, like the 'need' which must be shown under section 207, a fact which must be established through a formal hearing in each instance.

"Substantially the identical argument was considered in St. Louis, Mo.-East St. Louis, Ill., Commercial Zone, supra, and we find no occasion now to repeat the discussion or revise the conclusion there reached that the determination of the limits of a commercial zone for the purpose of applying the exemption provided by section 203(b) (8) of the Interstate Commerce Act is an 'agency statement of general * * * applicability and future effect designed to implement (and) interpret * * * the law,' and as such is squarely within the definition of rulemaking under section 2(c) of the Administrative Procedure Act. Of necessity, every agency contemplating the promulgation of a rule, even though it draws upon its experience as an informed expert in its field, must first determine the facts upon which it is going to act or which control the exercise of its judgment and discretion and the mere circumstance that a determination or examination of such facts is involved does not make the contemplated action an 'adjudication' as distinguished from 'rulemaking.' In this connection it is observed that, under section 2(d) of the Administrative Procedure Act, 'adjudication' means agency process for the formulation of an order, and an 'order' is, in turn, defined as the final disposition of an agency in any matter 'other than rulemaking.' Thus any action which properly qualifies as 'rulemaking' is automatically excluded from 'adjudication' and there is nothing in the Administrative Procedure Act to imply that the separation depends upon whether there has been a preliminary determination by the agency, for the purpose of study, of the facts which control its action."

It is argued that in fixing the commercial zones for some cities the Commission has accorded an adjudicatory hearing to carriers adversely affected; but as the Commission has pointed out, this was in the early stages of its dealing with the Motor Carrier Act and before sufficient experience had been acquired thereunder to justify informal investigations. With respect to this matter, the Commission has said, St. Louis, Mo.–East St. Louis, Ill., Commercial Zone, 61 M.C.C. 489, 492:

"The administration, enforcement, and execution of section 203 (b) (8) requires a determination of the territorial limits of the exemption provided for therein. There

was, however, even before enactment of the Administrative Procedure Act, no requirement that such determination be made after a formal hearing. In the beginning, commercial zone limits were determined after formal hearings. Later, informal investigations only were conducted. Most of the formal hearings held for this purpose, like the original hearing in this proceeding, were held before enactment of the Administrative Procedure Act, many of them at times when our experience in motor-carrier regulation was either negligible or considerably more limited than at present. As our experience increased the need for formal hearings diminished, and informal handling became practicable. See Kansas City, Mo.-Kans., Commercial Zone, 31 M.C.C. 5 and Commercial Zones and Terminal Areas, first and second supplemental reports, 48 M.C.C. 95 and 441. In these proceedings there were no objections to the lack of hearing but, in any event, we know of no requirement, either constitutional, statutory, or in any of our own rules of practice that would necessitate a formal hearing in a proceeding such as this. Whether or not we shall hold such a hearing has from the beginning been a matter within our discretion."

The Commission's holding that whether it shall hold a formal hearing in a rule making matter of this sort is a matter within its discretion is supported by the decisions of the Court of Appeals of the District of Columbia Circuit in Logansport Broadcasting Corp. v. United States, supra, 210 F.2d 24, 27 and of the Supreme Court in Securities and Exchange Commission v. Chenery Corporation, 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580, 1760, 91 L.Ed. 1995, where the Court said:

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency. See Columbia Broadcasting System v. United States, 316 U.S. 407, 421, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563."

█ Under the circumstances here, there was clearly no abuse of its discretion by the Commission; and it is worthy of note that the only persons complaining of the Commission's action are two carriers who are seeking to avoid competition from others whose terminal areas will be normally extended as a result of the extension of the Charleston commercial zone.

█ It is argued that the Commission should have exempted carriers of petroleum products from the effect of the zone extension so that such carriers serving the Charleston area would be confined to the area as limited when their certificates were granted; but this was clearly a matter within the discretion of the Commission, and there is no ground for holding that the discretion was abused.

For the reasons stated, the relief prayed for will be denied and the action will be dismissed.

Action dismissed.