SEA–LAND SERVICE, INC., a corporation, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 2524.

United States District Court
D. Delaware.
Aug. 8, 1963.

Aaron Finger, Wilmington, Del., and John W. McConnell, Jr., Mobile Ala., for plaintiff, and Armbrecht, Jackson, Mc-Connell & DeMouy, Mobile, Ala., Richards, Layton & Finger, Wilmington, Del., and Warren Price, Jr., Washington, D. C., of counsel.

Alexander Greenfeld, U. S. Atty., Wilmington, Del., Lee Loevinger, Asst. Atty. Gen., and John H. D. Wigger, Dept. of Justice, Washington, D. C., for the United States.

Robert W. Ginnane, General Counsel and H. Neil Garson, Associate General Counsel, Washington, D. C., for Interstate Commerce Commission.

Frank O'Donnell, Wilmington, Del., for Intervening Motor Carrier defendants; Peter T. Beardsley, Washington, D. C., Norman J. Bolinger, Jacksonville, Fla., F. G. Freund, Bryce Rea, Jr., Washington, D. C., Dan R. Schwartz, Jacksonville, Fla., James E. Wilson, Washington, D. C., and Berl, Potter & Anderson, Wilmington, Del., Schwartz, Proctor & Bolinger, Jacksonville, Fla., and Watkins & Rea, Washington, D. C., of counsel, for Intervening Motor Carrier defendants.

Joseph H. Geoghegan, Wilmington, Del., for Intervening Railroad defendants; James A. Bistline, Washington, D. C., Albert B. Russ, Jr., Jacksonville, Fla., T. Randolph Buck, and Richard A. Hollander, Richmond, Va., of counsel.

Before KALODNER, Circuit Judge and RODNEY and STEEL, District Judges.

STEEL, District Judge.

Plaintiff Sea-Land Service, Inc., an intercoastal water carrier subject to the Interstate Commerce Commission under Part III of the Interstate Commerce Act, brought the present action against the United States and the Commission seeking to suspend and set aside an order of the Commission which became effective on September 16, 1960.

The order directed Sea-Land, then known as Pan-Atlantic Steamship Corporation, to cease and desist from conducting motor operations (a) at Jacksonville and Miami, Florida beyond the boundary lines of their respective commercial zones as defined in Commercial Zones and Terminal Areas, 46 M.C.C. 155 (1946), and (b) at Tampa, beyond the

Tampa commercial zone as defined in the same case, and the boundary of the Hillsborough County Port District as established by Hillsborough County, Florida and the State of Florida.[1] The order was entered following a decision by Division 1 of the Commission which held that motor operations by Sea-Land from its ports at Jacksonville, Miami and Tampa, to points in Florida beyond the territorial limits stated, violated Section 206 (a) of the Act, 49 U.S.C. § 306(a), and the Commission's rules and regulations. The decision was based upon two findings: first, Sea-Land had failed to file an appropriate tariff designating the terminal areas of the ports of Miami, Jacksonville and Tampa in which it proposed to carry on motor operations; and second, the points which Sea-Land had designated to service by motor vehicle were outside of the "terminal area" of the ports as defined in § 202(c) (1) of the Act, 49 U.S.C. § 302(c) (1), and hence Sea-Land was not exempt by that section from obtaining a certificate of convenience and necessity as a motor carrier under Part II of the Act, which it had not done.

A number of common carriers by motor vehicle, trucking associations and railroads, some or all of which were parties to the proceeding before the Commission have been granted leave to intervene as defendants in the present action.

■ Jurisdiction to review the order and to suspend and set it aside if such action is warranted exists under Section 17(9) of the Act, 49 U.S.C. § 17(9), and 28 U.S.C. §§ 1336, 2321–2325.

Sea-Land is a water carrier plying between ports in the United States on the North Atlantic Coast and ports on the Gulf of Mexico, with interim ports of call. It holds Certificate No. W–376 and various subs thereunder issued to it by the Commission under Part III of the Act. These certificates authorize it to perform interstate cargo transportation services as a water carrier. It holds no similar certificate of authority as a motor carrier under Part II of the Act.

Sea-Land claims that its motor carrier operations between the ports of Miami, Tampa and Jacksonville, respectively, and other parts of Florida constitute "transfer, collection or delivery service[s]" in the "terminal area" of each port within the meaning of § 202(c) (1) of the Act, and hence under that section it is exempt from the certification requirements of Part II applicable to motor carriers.

Whether Sea-Land's motor carrier operations constitute "transfer, collection or delivery service[s]" within the "terminal areas" of the ports of Jacksonville, Miami and Tampa, despite the Commission's decision to the contrary, is the substantial question which this Court must decide. If they do, Sea-Land may conduct such operations as a water carrier under its certificate of public convenience and necessity issued under Part III of the Act. If they do not, the motor carrier service may not be performed, except under a certificate of public convenience and necessity issued under Part II of the Act.

Prior to 1957 Sea-Land had operated a freight and passenger water common

---

1. In the cited case the "commercial zone" of each municipality in the United States, subject to certain exceptions not presently pertinent, is defined at pp. 698–699:

   "The commercial zone of each municipality in the United States * * * consists of (1) the municipality itself hereinafter called the base municipality, (2) all municipalities within the United States which are contiguous to the base municipality, (3) all other municipalities within the United States and all unincorporated areas within the United States which are adjacent to the base municipality as fol-

lows: * * * when the base municipality has a population of 100,000 or more, all unincorporated areas within 5 miles of its corporate limits of the base municipality; and (4) all municipalities wholly surrounded, or so wholly surrounded except for a water boundary, by the base municipality, by any United States municipality contiguous thereto, or by any United States municipality adjacent thereto, which is included in the commercial zone of such base municipality under the provisions of (3) of this finding."

carrier service. This consisted principally of the transportation of break-bulk cargoes in conventional cargo vessels, between various Atlantic and Gulf Coast ports, among which were Houston, Texas, New Orleans, Louisiana, Tampa, Miami and Jacksonville, Florida, and New York, New York. In 1957 Sea-Land initiated its sea-land service by means of conventional C–2 cargo vessels which it had converted to carry containers of the size of conventional highway trailer bodies. These containers were loaded aboard and unloaded from the vessel by means of gantry cranes installed fore and aft of each vessel. The purpose of the operation was to decrease the time spent in loading and unloading cargo, reduce the cost of its handling, minimize loss from damage and pilferage, and enable the water carrier to provide door-to-door service to the shipping public.

Sea-Land's tariff provided for its performance of transportation service directly between New York (actually the Port of Newark) and 65 points in Florida through Port Jacksonville, 91 points through Port Tampa and 59 points through Port Miami. The points which Sea-Land proposed to serve were 5 to 56 miles from Jacksonville, 22 to 39 miles from Miami, and 23 miles to 68 miles from Tampa corporate limits.

In December, 1957, numerous motor carriers, which were authorized by appropriate certificates to engage in the transportation of general commodities between points and areas in Florida, filed two complaints with the Commission alleging that Sea-Land was holding itself out in its tariffs to conduct and was conducting extensive motor carrier operations in interstate or foreign commerce between Tampa, Jacksonville and Miami, Florida, on one hand, and numerous points in Florida on the other, in violation of certain sections of the Interstate Commerce Act, of the Commission's rules and regulations thereunder, and of its certificate. The complaints requested the Commission to institute an investigation and to enter an order determining and fixing the terminal area of Sea-Land under Section 202(c) of the Act, at Jacksonville, Miami and Tampa, and to direct Sea-Land to cease and desist its operations beyond such terminal areas in the absence of authority from the Commission. Sea-Land, in general, denied the allegations of the complaints and requested that both complaints be dismissed (I.C.C.Docket Nos. MC–C–2163 and MC–C–2167).

The matters were referred by the Commission to an Examiner for hearing on a consolidated record and extensive hearings were held. By consent or order, numerous interventions were filed by various motor carriers, rail carriers, a water carrier, and certain carrier associations. On November 3, 1958 the Examiner issued a recommended report finding that the complained of transportation was unlawful. Pan-Atlantic filed exceptions and on March 4, 1959 orally argued the matter before Division 1 of the Commission. On March 2, 1960 Division 1 rendered an opinion, Commissioner Webb dissenting in part, which adopted, in general, the Examiner's statement of facts and sustained his conclusions of law. Central Truck Lines, Inc., et al. v. Pan-Atlantic S. S. Corp., 82 M.C.C. 395 (1960).

The Commission stated that the "terminal area of a carrier whether motor, rail, or water carrier, or freight forwarded, may not exceed the area within which *bona fide* collection, delivery, and transfer, as distinguished from line-haul service is performed." It stated further that no collection, delivery or transfer service could be deemed to be *bona fide* if it extended beyond

> " * * * a single homogeneous community, identifiable as such by the factors of commercial and industrial integrity, population and business density, and the existence of some reasonably compact limit to the geographical scope of community affairs and influence, * * *."

Having thus defined the terminal areas of the Florida ports, the Commission held that any motor carrier service by Sea-

Land beyond these areas, without certification under Part II, was illegal.

Following an unsuccessful attempt by Sea-Land to have the decision reconsidered by the entire Commission, the cease and desist order presently challenged was entered.

The basic contention of Sea-Land is that the Commission erred as a matter of law in defining "terminal area" as it did. This error is said to have resulted from the Commission applying the same criteria or standards in determining the terminal area of Sea-Land, a water carrier, as are applicable to the determination of the "commercial zones" under § 203(b) (8) applicable to motor carriers, and in failing to consider and properly evaluate factors bearing upon the terminal area of a water carrier. The action of the Commission is said to have been arbitrary and capricious in view of its other decisions.

The question presented is primarily one of statutory construction, and the critical issue is the meaning of the words "terminal area" as used in § 202(c) (1).

. Preliminarily, a short statement concerning the scheme of the Interstate Commerce Act is desirable. By its enactment, Congress provided for the regulation of various types of interstate transportation. Different types of carriers are dealt with in different parts of the Act. Part I pertains to railroads, Part II to motor carriers, Part III to water carriers, and Part IV to freight forwarders. Under the Act, each type of carrier desiring to conduct an interstate operation must prove to the Commission that the public convenience and necessity requires that it be certified to have such operating authority. As stated, Sea-Land has been certified as a water carrier under Part III, but not as a motor carrier under Part II.

Certain types of transportation enumerated in the Act are specifically exempt, either in whole or in part, from the Act. We are directly concerned with § 202(c) (1) which contains one of the exemptions. It provides that railroads, water carriers and freight forwarders which are subject to Parts I, III and IV, respectively, may, as an incident to their service, conduct interstate operations by motor vehicle "in the performance within terminal areas of transfer, collection, or delivery service;" and in such case such incidental motor service shall be considered to be and shall be regulated as railroad, water carrier or freight forwarder service, subject to Parts I, III or IV of the Act, as the case may be.

What Congress meant by the "terminal area" cannot be ascertained from the Act itself. Although the words have been used they are not defined. Nor is there anything in the legislative reports or discussions which preceded the enactment of § 202(c) (1) which illuminates the meaning of the term. Nevertheless, interpretative aid is found in decisions of the Commission. Its view of the meaning of the Act is entitled to great weight. United States v. American Trucking Ass'ns., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

In New York S. & W. R. Co. Common Carrier Application, 46 M.C.C. 713, 722 (1946) the Commission pointed out that although the statute did not contain a definition of "terminal area", what Congress had in mind was clear in the light of earlier decisions of the Commission. It stated that for many years prior to the enactment of § 202(c), the Commission in reported cases relating to collection, delivery and transfer services had used terms such as "terminal district", "terminal area", "terminal services", "terminal facilities", "terminal handling of freight", "terminal trucking services", and "terminal operations". As a result of such usage, the Commission said, the areas within which terminal services were generally performed, where terminal facilities were available, and where terminal handling of freight and other terminal operations occurred— i. e., the areas within which collection, delivery or transfer services incidental to some-line-haul or other intercommunity service were given—had acquired recognition as "terminal districts" or

"terminal areas",—and this was clearly the meaning of "terminal areas" which Congress had in mind when § 202(c) was enacted. The Commission then defined "terminal area" as "the area within the limits of the municipality or immediately adjacent thereto within which it offers, either free or for an additional charge, *bona fide* collection, delivery or transfer service, as distinguished from line-haul service". The Commission recognized, as it had earlier in Pick-up of Livestock in Illinois, etc., 248 I.C.C. 385 (1942) that it was often difficult to draw a dividing line between terminal pick-up and line-haul service.

The particular problem which the Commission had before it in the New York S. & W. R. Co. case was the applicability of Part II to motor service operated as an adjunct to carriage by rail. But the context strongly suggests that the views of the Commission were not limited to the rail-motor relationship.

Later, in Commercial Zones and Terminal Areas, 54 M.C.C. 21 (1952), the terminal area of motor carriers and freight forwarders was defined as generally being co-extensive with a commercial zone of the municipality serviced by the motor carriers and freight forwarders. No such general definition, however, was promulgated with respect to terminal areas of rail or water carriers.

More recently, in Sause Bros. Ocean Towing Co. v. W. R. Chamberlin & Co., N. MC–C–3441, decided August 29, 1962, the Commission has said the maximum permissible limits of the terminal area of a water carrier must be determined upon the facts in each case. But this was not intended to mean that Commission's power of determination was unfettered. The views of the Commission previously referred to and the considerations hereafter stated indicate that guide lines do exist for the determination of terminal areas of water carriers,

and that the definition adopted by the Commission in the instant case and its application to the facts before it were entirely reasonable.

Some indication of the meaning which Congress intended to ascribe to "terminal area" in § 202(c) (1) is obtained by considering it in relationship to § 203 (b) (8), 49 U.S.C. § 303(b) (8). The latter was part of the Motor Carrier Act enacted in 1935. It is now found in Part II of the Act applicable to interstate motor carriers.[2] Section 203(b) (8) made Part II inapplicable to interstate transportation

" * * * wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, * * *."

But immediately following this exemption, there was an exception which read:

" * * * except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone * * *."

In Commercial Zones & Terminal Areas, 54 M.C.C. 21, 49–50 (1954) the Commission explained the inter-relationship of § 202(c) (1) and § 203(b) (8) by pointing out that under § 203(b) (8) the partial exemption of "local" transportation therein provided for was withheld when "local cartage" was "part of, or incidental to some line-haul or inter-community service." The Commission stated that § 202(c) was added to the Act in 1940 and 1942 for the purpose of supplementing § 203(b) (8) to provide for a partial exemption from direct regulation under Part II "of local transportation of the type which was excluded from the exemption provided by § 203(b) (8)." It concluded that the combined

2. What is now known as Part II of the Interstate Commerce Act was designated at the time of its original enactment in 1935 as the Motor Carrier Act of 1935. In 1940 its designation was changed to Part II of the Interstate Commerce Act. Historical note to 49 U.S.C.A. § 301.

effect of the two sections was to partially exempt from regulation under Part II of the Act "all purely local motor transportation, in interstate or foreign commerce, within municipalities or within the commercial zones thereof, and partially to exempt from direct regulation under Part II similar local operations, namely, transfer, collection and delivery performed within the 'terminal areas' of line-haul carriers in connection with some intercity or intercommunity line-haul services." This same view was expressed in Rheman Co. v. United States, 133 F.Supp. 668, 670 (D.C., 1955). In Palisano Common Carrier Application, 30 M.C.C. 591, 594 (1941), the Commission explained the purpose of § 202(c) (1) as it related to § 203(b) (8) by stating that § 202(c) (1) expanded the scope of the exemption provided under § 203 (b) (8) so as to apply to cases of "local cartage" which were not covered by the 203(b) (8) exemption.

■ It is not to be inferred that in every instance the limits of a "terminal area" under § 202(c) (1) must identically correspond with the area in which local transportation is exempt under § 203(b) (8). The permissible limits of a terminal area at a particular point for a particular carrier may be smaller than the area defined in § 203(b) (8), as was held in Pickup v. Delivery Limits at Los Angeles, 293 I.C.C. 633, 673–674, (1954), or it may be larger as the commission held in the instant case at Tampa. Neverthless, the "terminal area" limitation of § 202(c) (1) and the area defined in § 203(b) (8) are kindred concepts. In essence the exemption from certification provided for in § 202(c) (1) and § 203 (b) (8) pertains, in each case, to transportation of a local type. Although, "local" is obviously a concept of considerable flexibility and is subject to various gradations of meaning, there are limits beyond which it cannot be stretched in delineating the terminal area under § 202(c) (1) without doing violence to its ordinary significance in the context of a particular case. Here the terminal area limitation imposed by the Commission

represented a proper exercise of its judgment in a field in which it is particularly qualified to speak and is consistent with the congressional purpose which underlay the enactment of § 202(c) (1).

Sea-Land argues that the Commission erred in fixing the terminal areas of the Florida ports without recognizing or properly evaluating factors which would have required the Commission to find that the points designated in the tariffs were embraced within the terminal areas of the ports. Special emphasis is put upon the Commission's alleged failure to give sufficient weight to the fact that the territory surrounding the ports was rural and dominated by agricultural pursuits. The nature of the environment of each port, it is argued, made the area which included the pick-up points "a homogeneous community", which is the essential ingredient of a terminal area, as the Commission defined it.

■ The facts upon which this contention rests are not disputed. The bulk of Sea-Land's traffic moving out of Tampa was furnished by canned citrus processing plants located far distant from the port of Tampa. Similarly, an important part of Sea-Land's potential traffic at Miami and Jacksonville consisted of agricultural commodities processed at plants miles beyond the outermost limits of those ports. The nature of the traffic of a carrier has been recognized as an important factor in determining its terminal area. New York Susquehanna & Western R. R. Co., 34 M.C.C. 581, 584 (1942). As a specific application of this, Sea-Land cites Pick-up of Livestock in Illinois, etc., 248 I.C.C. 385 (1942) in which, Sea-Land asserts, the Commission recognized that the communal homogeneity essential to a terminal area need not necessarily be urban in character. There, the Commission said that the light traffic required "an exceptionally large terminal area for carload livestock and pickup services" and that "operations and practices applicable to livestock in this particular origin territory are not necessarily applicable to other commodities and to other localities." But despite

these statements, the Commission determined that the terminal area should not exceed a radius of ten miles from the railroad station. The Commission noted that this was "an exceptionally large terminal area" and that it should "not be extended". It is difficult to perceive how Sea-Land gets any consolation from this decision.

Another focal point at which Sea-Land attacks the Commission's decision is its asserted failure to give substantial weight to the relative distance of its water carriage service as compared with its motor carrier operations. Thus it is pointed out that from New York to Tampa is 1,614 statute miles, to Miami is 1,139 statute miles, and to Jacksonville is 915 statute miles. The mileage between the ports and the various points which Sea-Land proposes to service by motor carrier is, of course, relatively small as compared with its line-haul water carriage. The Commission recognized this. Nevertheless, it rejected the contention of Sea-Land that the relative mileage factor should be controlling to a "major degree". No decision has been brought to our attention which supports the view that the relative mileage here involved, either alone or in conjunction with other factors, requires a determination that the terminal areas of the Florida ports are more extensive than the Commission has found.

Prior to Sause Bros. Ocean Towing Co. Inc. v. W. R. Chamberland & Co. No. MC–C–3441, decided August 29, 1962, in no case cited by Sea-Land did the Commission approve a terminal area for a water carrier more extensive than either the "commercial zone" of a port

city, or the area over which a port authority exercised jurisdiction. See Newtex S. S. Corp., Collection and Delivery Service, 273 I.C.C. 304 (1948), and Thames River Line, Inc., Common Carrier Application, 250 I.C.C. 245 (1942). In Sause Bros. the Commission approved a terminal area for Chamberland & Co., a water carrier operating between ports in Oregon and California, which enabled it to transport by uncertified motor vehicles to the port of Crescent City, California, lumber originating at a mill 31 miles distant from Crescent City dock and 30 miles from the city's municipal limits. The Commission concluded, seemingly, that motor transportation from points beyond the "commercial zone" or port district was permissible since there was no proof that such points were "geographically, economically, commercially, and industrially separate communities completely independent" of the port.[3] Since community homogeneity was not negatived by the evidence, the decision is understandable. It is in no wise inconsistent with the Commission's decision in the instant case, where the Commission found, upon adequate evidence, that "points beyond the Hillsborough County Port District and the commercial zones of Jacksonville, Tampa, and Miami are geographically, economically, commercially, and industrially separate communities completely independent of the base municipalities or ports at which defendant is authorized to serve."[4]

In Pickup of Livestock in Illinois, etc., supra, the Commission stated that if railways desired to conduct truck operations outside of terminal areas, they

3. Actually, it is not clear from the opinion whether the terminal area at Crescent City did extend beyond the port district of Crescent City, since the Commission stated that evidence of the extent of that port district was not a matter of record. The opinion strongly indicates, however, that although the precise limits of the Crescent City port district were not disclosed by the record, the Commission believed that some of the points which Chamberland & Co. was serving were beyond whatever the outer most limits of the port district may have been.

4. Furthermore, in Sause Bros. the Commission pointed out, as meriting consideration, the circumstances that the water carrier held a specific commodity authority to transport lumber as a contract water carrier and could not participate in joint rates or interline movements with other carriers. In the case before us Sea-Land is a common carrier authorized

must obtain certificates of convenience and necessity as truck operators or enter into joint rates with authorized common carriers.

Either of the suggested alternatives are available to Sea-Land. Its existing tariffs enable it to quote through-rates for transportation by water in conjunction with motor carriers certified under Part II. Some of these motor carriers have agreements with Sea-Land which enable them to rent trailer chasis and box equipment owned by Sea-Land. If Sea-Land's efficiency is impaired because of the absence of cooperation by the certified carriers, as it argues, the alternative still remains for it to seek certification as a motor carrier under Part II.

■■ Admittedly, to determine the precise periphery of a terminal area of a port is not an easy task. But it is one that Congress has entrusted to the Commission. Compare United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 480, 62 S.Ct. 722, 86 L.Ed. 971 (1942). In reviewing the Commission's order our function is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. United States v. Pierce Auto Freight, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946). From both viewpoints we are of the opinion that the terminal area limitation imposed by the Commission was justified.

It is the contention of the Commission and some of the intervenors that although Sea-Land has designated the inland points which it proposes to serve, it has failed to designate the "terminal areas" to be served and therefore from a technical standpoint its tariffs are insufficient. They likewise assert that because of Sea-Land's delay in seeking to set aside the Commission's order the doctrine of laches necessitates a dismissal

to transport general commodities by water, and already has combination rate tariffs which enable it to participate with certified motor carriers in moving cargo

of the complaint. These questions need not be dealt with in view of what has previously been said.

An order will be entered dismissing the complaint.

from ports of origin outside of Florida to inland points in Florida through the ports of Miami and Jacksonville and Tampa.